John **PATLER**, Petitioner,

v.

**A. E. SLAYTON, Jr.,** Superintendent, Respondent.

Civ. A. No. 484–72–R.

United States District Court,
E. D. Virginia, Richmond Division.

Jan. 11, 1973.

Elise B. Heinz, Arlington, Va., for plaintiff.

Linwood T. Wells, Asst. Atty. Gen., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

John Patler, a Virginia prisoner seeks a writ of habeas corpus, 28 U.S.C. § 2254, to redress an allegedly illegal conviction for first degree murder in the Circuit Court of Arlington County on February 27, 1968. The respondent has moved to dismiss and the petitioner, given an opportunity to respond thereto, has done so by counsel. The petitioner has, by admission of the respondent, exhausted his available state remedies so that this matter is properly before the Court for disposition on the merits. 28 U.S.C. § 2254 (b). Counsel have thoroughly briefed the issues raised by the petitioner and the respondent has forwarded to the Court the state trial records. It is upon the memoranda and records before it that the Court concludes that a plenary hearing is not required and makes the following findings of fact and conclusions of law.

The facts are not in dispute. George Lincoln Rockwell, leader of the American Nazi Party, was shot and killed from ambush at noon on August 25, 1967. Patler, well known to the local police as a Nazi or ex-Nazi, (he had been expelled from the Nazi party prior to the homicide), was a half hour after the crime seen at a bus stop one mile away from the ambush site. He was arrested, taken to the police station, and later that afternoon served with a warrant formally charging him with first degree murder.

Thereafter, Patler was produced at a "show-up" before several witnesses who had seen a man running near the scene of the crime. Patler has attacked the legality of the show-up, the evidence adduced thereby, and other identification testimony.

The day following, the police found what was determined to be the murder weapon, a Mauser pistol, in a creek near the scene. They subsequently went with a search warrant to a farm owned by one Sam Ervin, Patler's father-in-law, and shared on occasion by the Patler family. The police were told by Lester Miller, an Ervin employee, that Patler had been target shooting in July 1967 (the month before the Rockwell murder) and they were directed to the general area where the shooting had occurred. The police proceeded to the area, in a mowed and open field approximately 250 feet from the farmhouse, and with an axe removed several slugs from a tree. Although the trial court ruled the search warrant invalid on its face, it allowed the prosecution to introduce these slugs into evidence. These slugs, by virtue of ballistics tests, connected Patler to the murder weapon. The petitioner has challenged the trial court's evidentiary ruling as heretofore referred to.

Upon trial, the prosecution introduced F.B.I. tests of the physical evidence near the close of its case. Patler contends that said evidence was exculpatory and that the prosecution's refusal to make pretrial disclosures thereof was prejudicial to the defense and violative of petitioner's constitutional rights.

These contentions and the specific findings of fact and conclusions of law appurtenant thereto will be considered *in seriatim*.

### I.

Patler contends that the above mentioned "show-up" was unconstitutional. The courtroom testimony of two witnesses is challenged in this regard.

After petitioner's arrest he was confined at police headquarters for several hours. Several persons who saw a man running near the scene of the crime were assembled at the police station and seated on a bench outside the office in which petitioner was confined. Petitioner, without the knowledge of his counsel who was present, was then led by the police past said witnesses. One of them, Mrs. Nancy Thoburn, testified on *voir dire* examination as to this encounter. The

trial court, upon considering this procedure, ruled that

> The type of showup which was conducted here was the type that was castigated by the Supreme Court as the worst possible kind, namely the one in which the defendant is shown to the eyewitness in handcuffs in custody with no one else there with whom they can compare him.

The Court nevertheless found that Mrs. Thoburn's recollection of the on-the-scene identification was sufficiently strong so as to have independent validity. Accordingly, the trial court ruled that it would allow identification testimony with respect to her on-the-scene observations and with respect to what she later told the police, but barred testimony concerning later identification, prohibiting as well an in-court identification on the basis that the show-up may have prejudicially crystallized her earlier recollections (Tr. 622).

■ Upon reviewing the trial transcript, this Court concurs in this ruling. Mrs. Thoburn's original on-the-scene recollections constituted an independent source of identification which, by themselves, were not tainted by the show-up. Accordingly, the witness' testimony as to on-the-scene identification (and her later recounting of same to the police) did not violate petitioner's due process rights. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

The problem here, however, arises by virtue of what followed this ruling. Near the end of the prosecution's direct testimony, the Court allowed, over objection, the following colloquy:

Mr. Hassan [Comm. Atty.]: Did there come a time when you made any statement to the police officers concerning what you have just described and its relationship to any picture or line viewing of Mr. Patler?

Mr. Harrigan [Patler's Atty.]: Object, Your Honor.

Court: The objection is overruled.

Mr. Harrigan: Except.

Witness [Mrs. Thoburn]: I had an opportunity to see Mr. Patler at the police station the same day, August 25.

Mr. Harrigan: I object to that, Your Honor.

Mr. Hassan: What she told the police.

Court: We just want to know what you told the police officer about your impressions of Mr. Patler.

Witness: At that time I recall seeing —when I say seeing—when I was asked if I could make an identification, I said there wasn't any conflict in his appearance to the man I had seen, there was nothing about him that conflicted my mental picture of what I had seen earlier that day.

The issue arises as to whether the prosecution put in evidence through the back door which Stovall may have proscribed through a more direct approach. Redefined, the question is thus whether or not the above recited testimony is the functional equivalent of a direct in-court identification, which identification was clearly prohibited by the principles of Stovall.

■ The purpose of the exclusionary rule is to prevent introduction of identification evidence which, by reason of prejudicial exposure, is unreliable. The theory relied on by the trial court here is that the witness' recollection of events was valid at one point (before the show-up) and tainted at another (after the show-up), but that the witness' ability to clearly differentiate her thoughts at these two separate times would allow valid testimony as to the first identification. This is somewhat different from the usual Stovall problem, in which a witness' on-the-scene identification is (or isn't) strong enough so that the witness is (or isn't) unduly influenced by subsequent illegal exposure. Here the Court found a crystallization of the witness' earlier recollections of a running man into a positive association of those recollections with Patler as a result of the show-up. Whether the witness could properly be expected to set aside that

association in recounting her on-the-scene observations (and thus avoid tailoring them to subsequent views of Patler) presents the difficult question.

Pursuant to the rules of *Stovall, supra,* and the recent Neil, Warden v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972),

> [T]he central question [is] whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Neil, *Warden, supra.*

Mrs. Thoburn's testimony in Court consisted of the following:

BY MR. HASSAN:

Q. Mrs. Thoburn, the last question [prior to the *voir dire*] was did you come to the police station. You said yes, I recall?

A. On August 25th.

Q. On August 25, 1967?

A. Yes.

Q. Were you interviewed at that time?

A. Yes.

Q. Do you know the name of the officer who interviewed you?

A. No.

Q. Do you recall what you told the officer?

A. Yes.

Q. Would you please tell the court and the jury what you told the officer?

A. I told the officer that I had seen a man and passed him on the street on August 25th, as I was coming home from the Bon Air Park. I live on Liberty Street close to Wilson Boulevard.

As I was walking home, two of my children had run ahead of me and one of them was holding my hand. As we approached the intersection of Liberty Street and 9th which is a very short distance from Wilson Boulevard, I noticed a man; I think the reason I noticed him was because of his hurry. He seemed to be running, not real fast, but he was running. He seemed to be in a great hurry. I think this is what took my attention and I looked back at him again, and as we passed, I was going toward Wilson Boulevard, he was going away from Wilson Boulevard, and I had the opportunity to observe him as we passed until he had passed by me.

What I noticed about the man was that he had dark hair; and it seemed to be longer hair as opposed to baldness or a crew cut. I noticed a bushyness and I noticed a dark complexion, and a beard line that would go with a brunette. He was of medium build and height. He was wearing a long coat of some type, although I can't exactly identify it in every detail, but it appeared to be a neutral color. Also, his pants impressed me as being a dark gray, and he wore a hat; and I noticed one thing that stood out was that his pants' legs were wet. It had been raining all that week, and it was very wet and the creek in Bon Air Park was swollen; and I had been there floating a raft with my boy, and I noticed—

MR. HARRIGAN: Excuse me, ma'am.

It sounds like she is just ad-libbing now, and the question is what she told the police.

MR. HASSAN: If Your Honor please, she is not ad-libbing at all. I asked her to tell what she told the police officers. When she was previously on the stand, she did mention that the pant legs were wet halfway up and that she herself was wet from being in Bon Air Park. That was her testimony before.

THE COURT: Her testimony as to what she told the police is in effect as to what she told the jury here.

THE WITNESS: Yes.

THE COURT: All right.

THE WITNESS: But as I noticed, I very vividly remember that the man who was running had wet pants' legs. I don't know what else I can say except that I did not notice anything in his hands. I was asked this in the police station. I did not notice anything in his hands at that time; but I did notice the looseness, the loose-fitting coat, and it was a longer coat as opposed to a short jacket or a dress coat. It was a longer type coat, and I saw a hat on the man that I saw running.

[Then followed the colloquy, *infra*, in which the witness stated these recollections were consistent with her show-up view of petitioner.]

■ The Court concurs with the learned trial judge that the above quoted testimony was substantially independent from the later viewing of Patler so as to have been properly admissible. The Court is prompted to this by several factors, following the analysis suggested in *Neil, Warden:*

1) The witness had the opportunity to observe the person described as he ran past her and her children.

2) The degree of attention and accuracy of observation are substantiated by the detailed nature of the description, which description is addressed to details which would logically be observed on the street where identification was made.

3) The witness' description of the police station encounter, while noting "consistency" does not add further observations about such other characteristics which might be noticed on such an encounter (as eye color, facial characteristics, etc.)

4) The length of time between the on-the-scene observation and police encounter was relatively short, thereby lessening the opportunity for the show-up to "fill in the gaps" of observation which might otherwise, had the time interval been longer, been forgotten.

In short, the "totality of circumstances" support the legality of the testimony objected to.

The second witness testimony challenged here is that of Mrs. Alma Kilpatrick. Mrs. Kilpatrick's on-the-scene identification consisted of a viewing from her car of a running man. Said viewing, according to the witness, lasted a period of 3–5 minutes, though Mrs. Kilpatrick admits the time may have been shorter. She was subsequently shown sets of pictures by the police, but failed to identify Patler, the petitioner, from them. She stated she saw pictures of Patler on TV. She then attended two sessions of the preliminary hearing for the purpose of obtaining a good look at Patler.

Upon trial, Mrs. Kilpatrick's testimony on direct examination consisted of the following:

Alma L. Kilpatrick was called as a witness on behalf of the Commonwealth, and having been duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

BY MR. HASSAN:

Q. Will you please state your name and your address?

A. Alma L. Kilpatrick, 6122 Brook Drive, Falls Church.

Q. Mrs. Kilpatrick, directing your attention to the 25th day of August, 1967, did there come a time when you were in the shopping area at Dominion Hill?

A. Yes.

Q. What time of the day was that please?

A. About a quarter to twelve or around there.

Q. What did you observe, if anything?

A. I observed a man on the brick wall in the back of the Goodwill who looked down—

Q. Where were you at that time?

A. My car was parked back there, and I had just started my car up when he came running across from the fence, and I looked at him right through the windshield and I had to stop my car. He ran around in the back of my car and then looked up toward where Mr. Rockwell's body was later found, turned around and ran back over the fence.

Q. Can you give us a description of the individual you saw?

A. I believe that he was dark haired and he had either a brownish or a dark brown coat on, and he looked something like what Mr. Patler looks like.

Q. Where did you see Mr. Patler?

A. I saw Mr. Patler again in the courtroom.

Q. Now, when he went back past your car, where did he go?

A. Ran back over the brick wall.

Q. Over the brick wall?

A. Yes.

Q. No further questions.

At this point a *voir dire* examination was held, whereby the above-described sequence was adduced in testimony. The examination contains, *inter alia*, the following colloquy:

BY MR. HARRIGAN:

Q. What was the full period of time that you say you observed this individual?

A. I couldn't judge that, maybe three minutes, maybe five minutes. I don't think it took him that long.

Q. Three minutes?

A. Maybe three minutes, maybe five minutes. I don't think it took him that long.

Q. All right.

A. It wasn't any long period of time because he ran very quickly out there, and he ran around.

Q. It could have been a matter of seconds?

A. It could have been. It seemed longer.

THE COURT: Let me interrupt you just a minute, Mr. Harrigan.

Mrs. Kilpatrick, will you straighten me out on the sequence of events?

You saw the man running in front of your car so that you saw him through the windshield?

THE WITNESS: He ran toward my car. I was backing up, and I saw him through the windshield. Then I had to stop my car because he ran around in the back of it and looked up to where Mr. Rockwell's body was found, and at that time I didn't know that Mr. Rockwell was up there.

THE COURT: You mean he changed his direction? He was running toward the front of your car?

THE WITNESS: Yes, and turned and ran around the back, and I stopped my car.

THE COURT: He ran then down beside your car, around behind it?

THE WITNESS: Right.

THE COURT: Changing his direction?

THE WITNESS: Right, and then he turned after he had looked up, because I watched him.

THE COURT: Where was he when he turned behind your car?

THE WITNESS: Just a little bit behind my car.

THE COURT: Then what did you do?

THE WITNESS: I backed my car out.

THE COURT: What did the man do?

THE WITNESS: He ran back over the little brick wall right beside me, right in back of it.

THE COURT: You lost sight of him at that point?

THE WITNESS: Yes, Then I backed my car out and drove out into Wilson Boulevard and drove up the street, and I saw a man lying beside the car, people out there, and I thought there was an accident. I went on—

THE COURT: That is all right. You have gone as far as I needed. I just

wanted to see what you saw when you saw him.

BY MR. HARRIGAN:

Q. Now, you described the man as dark haired?

A. Yes.

Q. Did he have a hat on?

A. No.

Q. You are positive of that?

A. I am positive.

Q. And you say there was a brownish or dark brown coat?

A. Yes.

Q. Now, was that a coat or a jacket?

A. I thought it was like a carcoat. It was flying behind him, but I thought that, and I have stated that before.

Q. What about pants? Did you notice that?

A. I thought they looked darkish; I am not positive.

Q. Now, you have made the statement that at that time that man looked something like Patler. Was that your statement?

A. That is what I said. Yes, sir. I didn't say positively.

On the basis of the *voir dire* testimony, the trial court concluded:

> In this case, it seems to me that there has been a sufficient showing in the examination of this witness that she had an opportunity to observe the man who ran toward her car and behind it, and that she then made a rather equivocal identification from photographs. She had seen television. She got an indifferent view of him in the courtroom, and she appears to make what seems to be to me an equivocal identification of him today.

> At no point did she make a positive identification, but what identification she makes, dubious as it is, appears to me to be the direct product of what she saw while she was sitting in her car. It is reasonably obvious from her testimony that she did not form this impression from her first view of Mr. Patler in the courtroom. If that had

been where she formed her impression of him and is testifying that yes, this is the man that I saw in the courtroom, and it is from my view of him in the courtroom, and this is the man I saw. I don't mean she said that in so many words, but if she said that, the Wade case might be applicable although I am not prepared at this moment to rule whether notice of counsel is susceptible or not. At this point, it doesn't appear to reach that point so the objection is overruled.

Cross examination followed wherein Patler's counsel attacked the witness' poor eyesight, limited observations on the scene, later viewings of Patler (and the inconclusiveness therein), and credibility.

■■ This Court concurs in the trial court's ruling. The probative value of the witness' identification was minimal, but did have an independent source. The only prejudicial testimony here, if any, was Mrs. Kilpatrick's statement that the man she saw running "looked something like what Mr. Patler looks like." This statement falls short of an identification to the effect that she saw Patler running down the street. Moreover, and most importantly, there is no evidence that her initial identification was in any way strengthened or tailored to Patler's characteristics by the subsequent exposures.

## II.

Patler's second claim is that bullets recovered from a tree located on property he frequented were illegally seized and that their introduction into evidence was consequently a violation of his constitutional rights.

A few days after the crime, police officers went to a farm owned by Patler's father-in-law, with whose family petitioner and his family lived, in Highland County, Virginia. Acting under a warrant, they were directed to a pasture by one Lester Miller, an employee of Sam Ervin (Patler's father-in-law), where Miller had seen Patler target shooting. The police proceeded there and recover-

ed four slugs from an oak tree, which slugs were determined to have been fired from the murder weapon.

Prior to trial, the trial court held a suppression hearing. The court ruled the search warrant invalid, but proceeded to determine whether the seizure was made pursuant to the warrant and concluded it was not. The evidence showed that the area referred to was separated from the farmhouse by a fence, contained a barn, was kept mowed, was used by petitioner and his family for occasional picnics, and was entered by the searching officers through a gate.

■ Patler's counsel at trial advanced two arguments with respect to the seizure. First, it was contended that the seizure was the fruit of an illegal warrant in that the presence of the police on the property, by authority of the warrant, gave them opportunity to question Miller and subsequently locate the slugs. The trial court rejected this argument, concluding that the police could properly question Miller under any circumstances and that information gained thereby was valid, regardless of the illegality of the warrant. This Court concurs in that reasoning. The petitioner in any case appears to have abandoned that argument here.

The more serious question is whether the area searched was within Fourth Amendment protection so that the search thereof, by virtue of the invalid warrant, was illegal. The trial court held that the area in question was not so protected, relying in effect on a Supreme Court case of some vintage in an opinion by Mr. Justice Holmes, Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). The rationale of that case is succinctly summarized by Mr. Justice Holmes' own language, "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to open fields."

The Commonwealth Attorney argued that the shells and slugs were abandoned property. Addressing both arguments, the trial court's own conclusion as to these matters reads as follows:

THE COURT: The court's view of the Commonwealth's theory of abandoned property as being indistinguishable from that of properties being outside of the curtilage on the theory that property that is left in the home is constructively in possession of those in the home; property that is left in open pasture or woods is not constructively in their possession anymore.

The Constitution of Virginia forbids general warrants. The Constitution of the United States says that the houses, personal papers, and effects of citizens shall be protected from unreasonable search and seizure.

We're not dealing here with effects in the usual sense. We're not dealing with papers and we're not dealing with persons.

The question then resolves itself as to whether or not we're dealing with houses. Therefore, the argument on the curtilage becomes very much in point. Unlike the decisions in some states which apparently construe the dwelling house to include all of the property which is huddled in that location, Virginia seems to adhere rather rigorously to the common law view that the curtilage is that area around the dwelling house which is reasonably a part of the dwelling because it's used for necessary purposes in connection with habitation.

In former times that cluster of outbuildings which was necessary for the order and convenient use of the dwellers of the house was included in the curtilage whether or not surrounded by a hedge or fence or wall or moat. That would be the spring house, the kitchen, a summer kitchen, the store house, a root cellar, necessary houses of the kind which servants would go to in order to prepare the daily meals. Places where the family resorted to every day. Barns were and sometimes

were not considered to be within the curtilage depending on whether they would be used for daily purposes.

In this situation, it appears to me the curtilage of the house for all practical purposes was the fence which Mr. Ervin said was used to bound the dog. The family did not during daily use have to go outside that area, where the casings and slugs were found.

The use of a spot remote from the house because it's nice, a cool, shady place, by a stream for picnicing purposes is almost antithetical to it's being within the curtilage. They don't have picnics in their homes or on their porches. They go to a secluded place. Therefore, it's use as a picnic spot and a place where the children might go to play and build a fort seems to be not within the curtilage and shows to my mind a use by the family as one somewhat remote from the area used for the purpose of daily habitation.

Accordingly, it's the court's view that the property which was found there and sought to be introduced into evidence was not seized under the warrant and that no warrant was needed for it's acquisition, so therefore, will not be suppressed.

This Court cannot adopt this reasoning in light of the Supreme Court's pronouncement in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that the Fourth Amendment protects "people not places," discussion *infra*.

■ A more serious threshold question, however, concerns Patler's standing to invoke Fourth Amendment protection over property not owned by him.[1]

■ Prior to Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), there was some question as to who, beside the possessory owner of illegally searched premises, had standing to raise a Fourth Amendment claim.

The Supreme Court in *Jones*, addressed this problem and held that a "person aggrieved by an unlawful search and seizure" had standing to move to suppress. Further a person "aggrieved" is one against whom the search was directed. See United States v. Cobb, 432 F.2d 716 (4th Cir. 1970). The Supreme Court, however, subsequently reaffirmed and clarified the *Jones* rule in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) wherein it stated that *Jones* relaxed the old possessory rule by giving standing to persons in two specified cases:

1) When possession of the seized evidence is *an element of the crime*, the government is precluded from asserting the accused's lack of standing by reason of his lack of possessory interest in the searched premises.

2) No possessory interest is necessary (where possession of the seized evidence is not an element of the crime) when the person at whom the search was directed was *on the* premises at the time of the search.

See, United States v. Cobb, *supra*.

■ Applying this analysis to the instant case, the Court concludes first that the initial exception under *Jones* is not pertinent here. Possession of the slugs and casings seized was not an element of the crime. The question remains, therefore, whether the second exception applies. Here, too, the Court concludes that it does not as Patler was not on the premises (nor likely to be, the farm being used occasionally) at the time of the search.

Nevertheless, some cases present factual patterns similar to the instant case which at first blush give weight to the petitioner's position. In *Bumper, supra,* the petitioner lived with his grandmother whose house was searched under pretext of a search warrant. Though the issue

---

1. Though the issue has not been raised here, the Court notes in passing that Miller's actions cannot be construed as consent to search in that the search was premised on a warrant subsequently held invalid. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

in that case properly turned on whether the grandmother gave consent to search when told of a non-existent warrant, see note 1, *supra*, there occurs to the Court the collateral question of whether a search warrant was necessary in the first place. A close look at the facts, however, shows that the petitioner was charged with rape, the commission of which involved use of a rifle with which the victim and her boy friend were shot. The *Bumper* case may thus be read as falling within the first exception under *Jones*, giving validity to the unstated premise therein that a search warrant was necessary.

In United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), the petitioner challenged a warrantless search of his aunt's hotel room conducted in his and his aunt's absence. The Supreme Court held the search an invalid invasion of privacy and violative, thereby, of the mandate of the Fourth Amendment. This case, it should be noted, fits into the first category, *supra*, as the goods seized were narcotics and an element of the crime charged; a violation of narcotic laws.

The Court is reluctant, however, to reach its conclusion solely on the basis of a dry categorization of the extant law. Further support of this result is gathered by examination and application of the rationale of the standing cases.

■ The scope of the Fourth Amendment, as it extends both to elements of the crime and evidence appurtenant thereto, is the protection of the privacy of the person against whom the search is directed. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); United States v. Cobb, supra. The Supreme Court examined this rationale in Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), when it reviewed what was in effect a warrantless search of the defendant's office. The Court stated:

We hold that in these circumstances DeForte had Fourth Amendment standing to object to the admission of the papers at his trial. It has long been settled that one has standing to object to a search of his office, as well as of his home. See, *e. g.*, Gouled v. United States, 255 U.S. 298 [41 S.Ct. 261, 65 L.Ed. 647]; United States v. Lefkowitz, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877]; Goldman v. United States, 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322]; cf. Lopez v. United States, 373 U.S. 427 [83 S.Ct. 1381, 10 L.Ed.2d 462]; Osborn v. United States, 385 U.S. 323 [87 S.Ct. 429, 17 L.Ed.2d 394]. Since the Court in Jones v. United States, *supra*, explicitly did away with the requirement that to establish standing one must show legal possession or ownership of the searched premises, see 362 U.S. at 265–267 [80 S.Ct. 725, at 732, 334] it seems clear that if DeForte had occupied a "private" office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing. Cf. Go-Bart Importing Co. v. United States, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; Silverthorne Lumber Co. v. United States, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319]. In such a "private" office, DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors. It seems to us that the situation was not fundamentally changed because DeForte shared an office with other union officers. *DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups. This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in DeForte's custody.* (Emphasis supplied)

■ The gravamen of this language, as the Court interprets it, is that the

Fourth Amendment protection applies where there is a reasonable expectation of privacy. "Privacy," however, does not mean "secrecy," for there is no question that an open field in which articles are secretly stored is not private. See Hester v. United States, *supra*. Rather, the term "privacy" must, by the nature of its use, infer a possessory interest, not in the legal sense of ownership, but in the sense that the person claiming standing can reasonably expect to treat an area as private *and* reasonably expect others to recognize and respect the privacy of that area.

▇▇▇ Based on the evidence before it, the Court finds that Patler could not reasonably have expected privacy at the scene of the target shooting. The site in question was a picnic spot and play area used occasionally by the children of the Patler and Ervin household. The trial court viewed, and this Court is in accord, this area is not within the confines of the household area. The area was not within Patler's private domain, nor could he reasonably expect it to be. In short, the Court concludes, therefore, that Patler has failed to sustain an assertion of protected privacy. Accordingly, lacking standing to raise Fourth Amendment contentions here, his second claim is without merit.

### III.

Patler's third claim is that the prosecution withheld alleged exculpatory evidence until near the close of its case, thereby violating the spirit of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and prejudicing Patler's right to a fair trial by unlawful interference with his defense. The facts with respect to this claim are accurately summarized by the petitioner in his petition for certiorari to the Supreme Court. They are as follows:

> During the afternoon of the day of the crime, a cap and a reversible coat, brown on one side and black on the other with a mutilated woman's pantyhose stuffed in one pocket, were found under a tree a few blocks from the scene of the crime. (Tr. 777, 794–95).

On the afternoon of the next day, a 7.63 mm. Mauser pistol was found in a park several blocks away, lying between two rocks in a creek in about six inches of water. (Tr. 1434–35) This proved to be the murder weapon. (Tr. 1707–8) It was identified as the property of Robert A. Lloyd III, an active member of the Nazi Party, who testified that he had loaned it to petitioner in 1964. (Tr. 1806, 1812–13) Lloyd also testified that when he requested the return of the gun in 1965 petitioner told him it had been stolen or mislaid, and that the coat found under the tree "looked exactly like" one petitioner had worn. (Tr. 1813–14, 1824–25) Another Party member testified that the coat "is" petitioner's. (Tr. 1856) Petitioner denied that Lloyd had ever loaned him the gun and presented several witnesses who said they had seen it in Lloyd's possession after 1964. (Tr. 2469–70, 2178, 2276–76) The defense introduced a different black raincoat, found in petitioner's home the day after the crime, which he identified as his own. (Tr. 2562, 2464)

The police delivered their items of physical evidence to the FBI, where they were subjected to all the usual scientific tests, as was the clothing worn by petitioner at the time of his arrest and the towel he was carrying. Before the trial, petitioner's attorneys asked the trial court to order the reports of these tests and any exculpatory evidence possessed by the prosecution to be shown to defense counsel. This motion was denied. Late in the prosecution's case, the Commonwealth presented this evidence. Tests to establish whether the articles found under the tree or the towell had been associated with a firearm were negative. (Tr. 1709–11) So were tests attempting to associate any of these items with paint samples taken from the shopping center. (Tr. 1741–43) Petitioner's shoes could not have made the footprints found on the roof. (Tr. 1731–33) Soil found on petitioner's shoes did not match any of the 17 soil

samples taken along the escape route. (Tr. 1738–39) There were no hairs or anything else on the cap or the coat that could connect them to petitioner. (Tr. 1764) Neither the tar found on petitioner's shoes nor the tar taken from the roof contained identifying impurities; the expert witness declined to say they were identical, though he said they were similar: "Tar is tar." (Tr. 1745–46) There were no fingerprints on the murder weapon. (Tr. 1727–28)

■ Patler's counsel has characterized this testimony as exculpatory. This is inaccurate: the testimony on its face neither implicates nor exculpates the petitioner. It is, in fact, "neutral." That does not, *ipso facto*, however, preclude a conclusion that its introduction was prejudicial, for as any experienced trial attorney knows, a sheer bulk of evidence, though irrelevant or ineffective on its face, may by reason of its literal weight favorably impress a jury.

The issues with respect to this claim are thus twofold:

1. Did Brady v. Maryland, supra, compel disclosure of this evidence, and if so, was said disclosure timely within the rule?

2. If *Brady* does not apply, does this introduction of this evidence raise a question of constitutional magnitude cognizable in federal habeas corpus?

The Court of Appeals for the Fourth Circuit has in effect answered the first inquiries in the positive. In Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964), the prosecution at trial introduced defendant's revolver for identification purposes. It had in its possession at that time evidence which tended to show that said weapon was not the instrument used in the crime charged, but said evidence was suppressed. With respect to the disclosure question raised thereby, the Court stated:

> In our view, all of this evidence tending to exculpate the petitioner became highly relevant the *instant his revolver was produced in open court,* formally

marked for identification, and witnesses interrogated about it. Presenting the gun, without explanation or qualification, could not fail to suggest an inference that this was the weapon used to commit the offense for which Barbee was on trial. If this was not meant to be suggested, there was no reason, indeed no justification, whatever for its formal production at the trial. *Once produced, it became not only appropriate but imperative that any additional evidence concerning the gun be made available either to substantiate or to refute the suggested inference. If the pistol was pertinent for any purpose, so also was the opinion of the ballistics expert that it was not the weapon used in the Fisher shooting.* We cannot say that the trier of fact would have given no weight to the ballistics report or the expert's testimony. As Judge Edgerton said in Griffin v. United States, 87 U.S. App.D.C. 172, 183 F.2d 990, 993 (1950):

> "[T]he case emphasizes the necessity of disclosure by the prosecution of evidence that may reasonably be considered admissible and useful to the defense. When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful."

(Emphasis supplied)

■ The rule enunciated in *Barbee* is clear: The prosecution has an affirmative duty to disclose any relevant evidence with respect to evidence produced at trial by the government which may tend to prejudice the accused's case. That duty becomes timely at "the instant [the initial evidence] was produced in open court."

■ The prosecution herein did not violate these standards. Once the physical evidence was in, the additional relevant evidence was produced. Taken in conjunction with United States v. Harris, 409 F.2d 77 (4th Cir. 1969), holding that *Brady* does not require pre-trial discovery, the Barbee case bars petitioner's

*Brady* claim: the prosecution's disclosure was both timely and complete.

The question remains, therefore, whether introduction of said evidence was violative of Patler's due process rights, upon any other theory. Evidentiary matters, as a rule, in the state trial are not cognizable in federal habeas corpus unless "fundamental fairness or [infringement of] specific constitutional protections" is in issue. Grundler v. North Carolina, 283 F.2d 798 (4th Cir. 1960). The *Brady* question being foreclosed to Patler, this Court is barred from further inquiry unless a showing of violation of fundamental fairness is made. While the Court is sensitive to advantages that may have flowed to the prosecution from the tactic used here, the Court is unable to conclude, especially in the light of the thorough cross-examination, that Patler's defense was in any way prejudiced to the substantial degree required by *Grundler*. Patler's third claim is without merit.

For the reasons assigned, summary judgment shall be granted to the respondent.

An appropriate order shall issue.