John PATLER, Appellant,

v.

A. E. SLAYTON, Jr., Superintendent of the Virginia State Penitentiary, Appellee.

No. 73-1169.

United States Court of Appeals, Fourth Circuit.

Argued April 1, 1974.

Decided Aug. 28, 1974.

Elise B. Heinz, Arlington, Va., for appellant.

Linwood T. Wells, Jr., Asst. Atty. Gen. (Andrew P. Miller, Atty. Gen., on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and CRAVEN and WIDENER, Circuit Judges.

CRAVEN, Circuit Judge:

John Patler was found guilty by a jury in the Circuit Court of Arlington County, Virginia, of the first degree murder of George Lincoln Rockwell, the head of the American Nazi Party. Patler was apprehended about one-half hour after the homicide less than a mile from the scene of the crime. The complex, "largely circumstantial" web of evidence upon which the jury verdict rested is set out in the opinion of the Supreme Court of Appeals of Virginia, which held that the verdict was based on sufficient evidence. Patler v. Commonwealth, 211 Va. 448, 452–456, 177 S.E.2d 618, 621–624 (1970). The United States Supreme Court denied a petition for certiorari on June 12, 1972.

On October 9, 1972, Patler sought a writ of habeas corpus from the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 2254. Three errors of constitutional magnitude were alleged: (1) that the identification testimony of two witnesses at petitioner's state trial was tainted by their presence at illegal show-ups and should have been excluded under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); (2) that the seizure of certain inculpatory evidence from a farm owned by Patler's father-in-law constituted an illegal seizure in violation of his [Patler's] fourth amendment rights; and (3) that the state's failure to release the results of tests on physical evidence introduced at trial until late in the proceedings, which evidence tended to exculpate the petitioner, was prejudicial to his defense and contrary to the due process requirements of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court, without a hearing, granted respondent's motion for

summary judgment. Patler v. Slayton, 353 F.Supp. 376 (E.D.Va.1973). We affirm.

## I.

At about noon on August · 25, 1967, Mrs. Alma Kilpatrick was backing her car from a parking space at a small shopping center in Arlington, Virginia, when she saw a man appear on the brick wall in front of her. He jumped down, ran behind her car, looked toward the area of the parking lot where Rockwell's body was later found, turned and ran back over the wall. Upon being asked at trial if she could describe the person whom she saw, Mrs. Kilpatrick responded:

A. I believe that he was dark haired and he had either a brownish or a dark brown coat on, and he looked something like what Mr. Patler looks like.

Q. Where did you see Mr. Patler?

A. I saw Mr. · Patler again in the courtroom.

Transcript 523. Mrs. Kilpatrick talked with police on the day after the shooting. Shown two different photographic spreads containing Patler's picture, she was unable to make a positive identification. It was then suggested that she attend Patler's preliminary hearing to obtain a view of the suspect. Failing to gain an unobstructed view of Patler, Mrs. Kilpatrick came to a second hearing. She at first declined to make a positive identification after the hearing, then changed her mind and informed the police that she could identify Patler, and finally concluded that she could not. On

voir dire examination she stated: "I have decided to say I can't positively because I know that would be a crime, that would be terrible. I can't do that." Transcript 543.

On this same day and at about the same time, Mrs. Nancy Thoburn was returning from Bon Air Park (located about four blocks from the shopping center where the shooting occurred) with her three children. As she walked up Liberty Street in the direction of the shopping center she saw a man running down the opposite side of the street in the direction of the park. Noticing him "because of his hurry," she testified that she described him to a detective who interviewed her that same day as having "dark hair," "a dark complexion," and "was of medium build ond height." Transcript 628. She further described his clothing:

He was wearing a long coat of some type, although I can't exactly identify it in every detail, but it appeared to be a neutral color. Also, his pants impressed me as being a dark gray, and he wore a hat; and I noticed one thing that stood out was that his pants' legs were wet.

Transcript 628. Later that same day Mrs. Thoburn went to the police station. She was seated on a bench together with three other potential witnesses outside of the room in which Patler was confined. Patler, handcuffed and escorted by several policemen, was led by the bench as he was transferred from one room to another.[1] The state trial judge, describing the show-up as "the worst

---

1. Mrs. Thoburn described the scene on voir dire examination:

Q. Did you go down to the police station on the 25th?

A. Yes.

Q. How many other people were down there?

A. There were three other witnesses there.

Q. Did you know what you were going down there for?

A. To give a description. I thought I was going down there to see if I could identify the man that I saw running.

Q. Where did you go in the police station?

A. To the detective's office.

Q. That is the third floor?

A. I guess it is; I couldn't say right now.

Q. Were you in the hall there?

A. We were in the office, and Mr. Patler's lawyer would not let us look at him.

Q. Who was that lawyer?

A. Mrs. Lane, I guess.

Q. She would not let you look at him?

A. That was the reason we were given for sitting so long in the office.

Q. Who gave you that reason?

possible kind," refused to allow Mrs. Thoburn to testify as to "any identification subsequent to that made at the police station." Transcript 622–23. But the following testimony by Mrs. Thoburn was allowed:

| | |
|---|---|
| Mr. Hassan: [Commonwealth's Attorney] | Did there come a time when you made any statement to the police officers concerning what you have just described and its relationship to any picture or live viewing of Mr. Patler? |
| Mr. Harrigan: [Patler's Attorney] | Objection, Your Honor. |
| The Court: | The objection is overruled. |
| Mr. Harrigan: | Exception. |
| The Witness: | I had an opportunity to see Mr. Patler at the police station the same day, August 25th. |
| Mr. Harrigan: | I object to that, Your Honor. |
| Mr. Hassan: | What she told the police. |
| The Court: | We just want to know what you told the police officer about your impressions of Mr. Patler. |
| The Witness: | At that time I recall seeing—when I say seeing—when I was asked if I could make an identification, I said that there wasn't any conflict in his appearance to the man I had seen, that there was nothing about him that conflicted my mental picture of what I had seen earlier that day. |

Transcript 630–31.

------

The Commonwealth argues that because the testimony of Mrs. Kilpatrick and Mrs. Thoburn was inconclusive and did not rise to the level of positive identification and because counsel was at all times present at (although admittedly uninformed of) the challenged show-ups, the *Wade-Gilbert* exclusionary rule does not apply and the testimony must be tested only under the "totality of the circumstances" as prescribed in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and explained in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The contention that the presence of counsel at these show-ups is enough to satisfy *Wade* and *Gilbert* flies in the face

A. The detectives. I don't know; that was what I heard. I did not see Mrs. Lane that day, period. This is the reason that I was given why we were kept waiting because his lawyer, whoever it was, would not let us see him.

Q. All right. Did they come out and finally tell you okay?

A. No, they did not.

Q. What happened?

A. They put a bench for us beside the elevator so that when he was changed from one room to another and brought down the hall that we would catch a glimpse of him then.

Q. Was he brought down the hall?

A. Yes.

Q. How many detectives were holding onto him?

A. I know there were at least two escorts.

Q. Was he handcuffed?

A. Yes.

Q. Was it pretty obvious who the defendant was and who the detectives were?

A. Yes, indeed.

Transcript 604–05.

of the sixth amendment right sought to be protected. Both *Wade* and *Gilbert* speak in terms of informed presence, *i. e.,* notice.[2] 388 U.S. at 237, 269, 87 S. Ct. 1967. The fact that Patler's counsel was present both in the hallway at the police station where Mrs. Thoburn and the other potential witnesses were seated and at the preliminary hearing which Mrs. Kilpatrick attended does not enable the Commonwealth to escape the strictures of the Supreme Court's mandate.

■ The state argues further that since Patler had not been indicted and the Commonwealth had not "committed itself to prosecute" [Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L. Ed.2d 411 (1972)] him, the *Wade-Gilbert* rule should not apply. The plurality opinion in *Kirby* does not set forth an "indictment" test but refers only to "the initiation of adversary judicial criminal proceedings—whether by way of *formal charge,* preliminary hearing, indictment, information, *or* arraignment." 406 U.S. at 689, 92 S.Ct. at 1882 (emphasis added). In a concurring opinion the Chief Justice added: "I agree that the right to counsel attaches as soon as criminal charges are formally made against an accused and he becomes the subject of a 'criminal prosecution.' " 406 U.S. at 691, 92 S.Ct. at 1883. There is no question but that Patler had already been served with a warrant charging him with first-degree murder, that he had been confined several hours and that his attorney was present at the police station at the time the show-up viewed by Mrs. Thoburn occurred. Mrs. Kilpatrick's viewing did not come until several weeks later. As to the show-ups viewed by both witnesses we find that

"adversary judicial criminal proceedings" had been initiated and that Patler was entitled to the informed presence of counsel under *Wade* and *Gilbert*.[3] United States v. Roth, 430 F.2d 1137, 1140–1141 (2d Cir. 1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1971). Cf. Stanley v. Cox, 486 F.2d 48 (4th Cir. 1973).

■ Although the failure of a witness to make a positive, in-court identification cannot be used by the state to insulate its improper identification procedures from scrutiny, it is entirely possible, we think, for a skilled trial judge to separate the tainted matter from what the witness actually observed at the scene of the crime and thus avoid an unnecessarily blunt application of the exclusionary rule of *Wade* or *Gilbert*. That is what occurred here.

■ We need not decide whether the improper show-ups might have suggested or strengthened Mrs. Kilpatrick's and Mrs. Thoburn's testimony in court, even to the point of positive identification, because the capable trial judge, alert to the problem, made certain that the questioning was limited to eliciting only what they saw at the scene and an inconclusive comparison with Patler's physical appearance. As to the latter he barely skirted constitutional error, for if there is a line between "resemblance" and "identification" testimony it is admittedly thin. *But see* United States v. Brooks, 146 U.S.App.D.C. 1, 449 F.2d 1077, 1083 (1971). Although thin, we think it a line worth drawing. Aside from police deterrence, the spirit of *Wade* and *Gilbert* is to prevent the conviction of those who may be innocent when a susceptible witness is unfairly

2. The following colloquy between the trial judge and the Commonwealth's attorney would tend to establish that there was no notice to Patler's attorney of the identification procedures:

The Court: Does the Commonwealth deny that his counsel was advised that he was to be shown to eye witnesses at that time?

Mr. Hassan: I don't think counsel was advised at any time. I don't think there is any requirement to advise counsel.

Transcript 621.

3. *Wade* and *Gilbert* are effective prospectively from June 12, 1967. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The identification procedures here challenged took place on or after August 25, 1967.

allowed to conclude: "he is the guilty one." It is far less dangerous to admit testimony, as was done here, that the malefactor was "dark haired" and "had a brown coat on" and "looked something like Mr. Patler," which was the gist of Mrs. Kilpatrick's testimony. We agree with the trial judge that:

> At no point did she make a positive identification, but what identification she makes, dubious as it is, appears to me to be the direct product of what she saw while she was sitting in her car.

Transcript 559.

As for Mrs. Thoburn's testimony, the trial judge was even more cautious, recognizing that the state had arranged views of "the worst possible kind." He therefore limited her testimony to what she told the officers at the police station —something short of even "resemblance" testimony. Under the announced limitation Mrs. Thoburn described the clothing of the person seen near the place of the crime; and, in response to whether she could make an identification, failed to do so, saying only that the appearance of Patler was not "in conflict" with the person she had seen.

In declining to order a new trial despite flagrant police violations of showup standards, we think we do no injury to the therapy of the exclusionary rule of *Gilbert*. For the lesson got to the trial judge and through him to the prosecutor and the police, and it is this: unfairly obtained identification testimony will not be freely received, and if allowed at all, it will be under such severe limitations that the prosecutor will be deprived of most of its potential for persuasiveness. Thus the purpose of the exclusionary rule, to deter the violation of the constitutional rights of those accused of crime, is served.

## II.

 Spent bullets and shell casings matching the murder weapon were seized from the pasture of a farm owned by Patler's father-in-law, Sam Ervin. Testimony at trial tended to show that the area from which the inculpatory evidence was recovered was occasionally used by the two families as a picnic area and as a play area for their children and had within a month prior to the shooting been used by Patler for target shooting. It was located 250 feet from the dwelling house and about 200 feet outside a fence which enclosed the house and outbuildings. Although the trial court found invalid on its face a search warrant obtained by officers prior to the search, the evidence was not suppressed on the theory that the area searched was outside the curtilage. The Supreme Court of Appeals affirmed, specifically relying on the "open fields" doctrine of Hester v. United States, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924). Patler v. Commonwealth, 211 Va. 448, 449–451, 177 S.E.2d 618, 620–621 (1970). The district court agreed that the evidence should not have been suppressed, although it found *Hester* to be inapplicable in light of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Instead the district court concluded that the use to which the area had been put was not such that Patler could "reasonably have expected privacy at the scene of the target shooting." Patler v. Slayton, 353 F.Supp. 376, 387 (E.D.Va.1973). Furthermore, the court held, he lacked standing to raise his fourth amendment contention, citing Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); and United States v. Cobb, 432 F.2d 716 (4th Cir. 1970). With the argument that Patler lacks standing we cannot agree. In *Cobb, supra,* 432 F.2d at 719, we said:

> In Jones v. United States . . . the Court, in construing Rule 41(e) which gives to any "person aggrieved by an unlawful search and seizure" the right to move to suppress evidence thereby secured, held that, "In order to qualify as a 'person aggrieved by

an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed*, as distinguished from one who claims prejudice only through the use of evidence gathered *as a consequence of a search or seizure directed at someone else.*" (Italics added) 362 U.S. at p. 261, 80 S.Ct. at p. 731. . . . .

While possession of the evidence seized here was not an element of the offense charged, Patler demonstrated both that he had a possessory interest in the property searched,[4] Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), and that the search was specifically directed against him. Having standing to raise the propriety of the search, Patler has, however, failed to demonstrate a reasonable expectation of privacy in the property actually searched. The maxim of *Katz* that the fourth amendment protects "people not places" is of only limited usefulness, for in considering what people can reasonably expect to maintain as private we must inevitably speak in terms of places. Speaking in such terms, we said under similar circumstances in United States v. Brown, 487 F.2d 208, 210 (4th Cir. 1973), cert. denied, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974):

Appellants' reasonable expectations of privacy—while extending to their dwellings and the immediate area around them and even to the area occupied by outbuildings such as the barns in question . . .—cannot, in light of *Hester*, be said to include the "open fields" around the barn.

*See also* United States v. Minton, 488 F.2d 37, 38 (4th Cir. 1973). Even if Patler could be said to have exhibited an actual expectation of privacy in the area searched, we cannot say that such an expectation is "one that society is prepared to recognize as 'reasonable.'" *Katz, supra*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

### III.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court announced the following constitutional principle:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

Petitioner alleges that his *Brady* rights were violated by the prosecution's failure to release the results of scientific tests made by the FBI on certain physical evidence until that evidence was introduced late in his trial.[5] The district

---

4. The record owner of the property, Sam Ervin, was Patler's father-in-law. The Patler and Ervin families resided in the same dwelling in Arlington, and both families used the Highland County farm frequently.

5. In his petition for certiorari to the United States Supreme Court petitioner itemized the various pieces of evidence, their relationship to the case against him and the results of scientific tests performed on them as follows:

During the afternoon of the day of the crime, a cap and a reversible coat, brown on one side and black on the other with a mutilated woman's pantyhose stuffed in one pocket, were found under a tree a few blocks from the scene of the crime. (Tr. 777, 794–95). On the afternoon of the next day, a 7.63 mm. Mauser pistol was found in a park several blocks away, lying

between two rocks in a creek in about six inches of water. (Tr. 1434–35) This proved to be the murder weapon. (Tr. 1707–8) It was identified as the property of Robert A. Lloyd, III, an active member of the Nazi Party, who testified that he had loaned it to petitioner in 1964. (Tr. 1806, 1812–13) Lloyd also testified that when he requested the return of the gun in 1965 petitioner told him it had been stolen or mislaid, and that the coat found under the tree "looked exactly like" one petitioner had worn. (Tr. 1813–14, 1824–25) Another Party member testified that the coat "is" petitioner's. (Tr. 1856) Petitioner denied that Lloyd had ever loaned him the gun and presented several witnesses who said they had seen it in Lloyd's possession after 1964. (Tr. 2469–70, 2178, 2276–76) The defense in-

court correctly characterized the test results as "neutral" rather than "exculpatory." 353 F.Supp. at 388. But such a characterization often has little meaning; evidence such as this may, because of its neutrality, tend to be favorable to the accused. While it does not by any means establish his absence from the scene of the crime, it does demonstrate that a number of factors which *could* link the defendant to the crime do not. There was good reason for the state to introduce Patler's clothing and shoes and the murder weapon. Several witnesses had seen a man running from the scene of the crime dressed in similar clothing, and one witness testified that the coat found along the escape route belonged to Patler. The murder weapon, so the jury could have found, had been loaned to Patler several years earlier and shell casings and fragments fired from it were found on his father-in-law's farm. He had been seen target shooting there a month before the shooting. Clearly the evidence was relevant. But, to paraphrase what we said in Barbee v. Warden, 331 F.2d 842, 845 (4th Cir. 1964), "[o]nce produced, it became not only appropriate but imperative that

any additional evidence concerning [these items] be made available either to substantiate or to refute the suggested inference[s]." Admittedly, the ballistics tests under consideration in *Barbee* were of much greater benefit to the defense than the scientific tests in this case. But whether the tests here are "favorable" within the meaning of *Brady* we need not decide. Assuming that an affirmative duty existed which required disclosure by the prosecution, such a duty was here satisfied.

■ Petitioner's argument rests, finally, on the assertion that disclosure was not timely. While there may be instances where disclosure comes too late to benefit the defendant, *see, e. g.,* Clay v. Black, 479 F.2d 319 (6th Cir. 1973); United States v. Gleason, 265 F.Supp. 880 (S.D.N.Y.1967), this is not such a case. Once the physical evidence was introduced by the prosecution, disclosure of the test results was made immediately. There followed a very thorough and searching cross-examination by petitioner's counsel. In light of the fact that *Brady* does not require pretrial discovery,[6] United States v. Harris, 409 F.2d 77, 80–81 (4th Cir. 1969), cert. de-

troduced a different black raincoat, found in petitioner's home the day after the crime, which he identified as his own. (Tr. 2562, 2464) The police delivered their items of physical evidence to the FBI, where they were subjected to all the usual scientific tests, as was the clothing worn by petitioner at the time of his arrest and the towel he was carrying. Before the trial petitioner's attorneys asked the trial court to order the reports of these tests and any exculpatory evidence possessed by the prosecution to be shown to defense counsel. This motion was denied. Late in the prosecution's case, the Commonwealth presented this evidence. Tests to establish whether the articles found under the tree or the towell had been associated with a firearm were negative. (Tr. 1709–11) So were tests attempting to associate any of these items with paint samples taken from the shopping center. (Tr. 1741–43) Petitioner's shoes could not have made the footprints found on the roof. (Tr. 1731–33) Soil found on petitioner's shoes did not match any of the 17 soil samples taken along the

escape route. (Tr. 1738–39) There were no hairs or anything else on the cap or the coat that could connect them to petitioner. (Tr. 1764) Neither the tar found on petitioner's shoes nor the tar taken from the roof contained identifying impurities; the expert witness declined to say they were identical, though he said they were similar: "Tar is tar." (Tr. 1745–46) There were no fingerprints on the murder weapon. (Tr. 1727–28)

6. *Cf.* Fed.R.Crim.P. 16(a)(1)(D), as amended (effective July 1, 1974) :

*Reports of examinations and tests.*—Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports . . . of scientific tests or experiments, made in connection with the particular case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government.

42 U.S.L.W. 4555 (April 23, 1974).

**480**

nied sub nom., Brown v. United States, 396 U.S. 965, 90 S.Ct. 443, 24 L.Ed.2d 430 (1969), and in the absence of any demonstration of prejudice to his defense from the failure of the prosecution to make the disclosure at an earlier point in the trial, petitioner's assertion of untimely disclosure must fail. Where, as here, the disclosure is timely, *i. e.*, occurring at or before the introduction by the prosecution of evidence to which the disclosed material logically relates and at a time when it can be meaningfully evaluated and utilized by the defense, there is no violation of due process.

The judgment of the district court is affirmed.

Affirmed.