**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Ray E. OLIVER, a/k/a Edward Ray Oliver, Defendant-Appellee.**

No. 80–5437.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 1, 1982.

Decided May 5, 1982.

Alexander Taft, U. S. Atty., Scott Wendelsdorf, Mikell McMurray, Louisville, Ky., William C. Bryson, Chief, Appellate Section, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Robert L. Wilson, Jamestown, Ky., for defendant-appellee.

Before EDWARDS, Chief Judge, and LIVELY, ENGEL, KEITH, MERRITT, BROWN, KENNEDY, MARTIN and JONES, Circuit Judges, sitting En Banc.

BAILEY BROWN, Circuit Judge.

In *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Supreme Court, in an opinion by Justice Holmes, unanimously held that the protection of the Fourth Amendment does not extend to open fields. This court, in *United States v. Hassell*, 336 F.2d 684 (6th Cir.

1964) (per curiam), *cert. denied*, 380 U.S. 965, 85 S.Ct. 1111, 14 L.Ed.2d 155 (1965), citing *Hester*, also held that Fourth Amendment protection does not apply to open fields. In the instant case, a panel of this court, relying on analysis it derived from *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), held that the owner of an open field may have Fourth Amendment protection if he reasonably expects privacy and that therefore the holdings in *Hester* and *Hassell*, to this extent, no longer stand. *United States v. Oliver*, 657 F.2d 85 (6th Cir. 1981). We conclude, on the contrary, that *Hester* is still good Fourth Amendment law, that *Katz* does not require an *ad hoc* consideration of the facts of each case to determine whether the owner of an open field reasonably expected privacy and that therefore *Hassell* is still the law of this circuit.

In the case before us, the appellee, Oliver, is a retired farmer who lives on his farm in the Western District of Kentucky and leases parts of it to others. In July, 1980, narcotics agents of the Kentucky State Police received an anonymous tip that marijuana was being raised on the farm. They had heard before rumors to this effect and so they decided to investigate.[1]

The agents approached Oliver's farm on Kentucky Highway 379 and turned off on a road on Oliver's land that leads past his house and then past a barn near the back end of the farm. A short distance beyond the house the agents encountered a locked gate that blocked the road, and there they parked their car and walked around the gate on a path adjacent to it. There were "No Trespassing" signs as one turned off Highway 379 and along the road leading to the house and another at this gate. The agents on foot continued down this road to the barn, which was located about three-fourths of a mile beyond the house. At the barn was a parked camper but no person

was present and the agents continued further on this road. Shortly thereafter, someone appeared near the camper and called to the agents to come back, explaining that hunting was not allowed, at which time the agents started back to the camper, announcing that they were Kentucky State Police. When they got back to the camper, however, no one was there. The agents then resumed their investigation, which resulted in their finding two open fields of marijuana at the back end of the farm.

The Cumberland River bounds the farm just beyond these fields of marijuana. The marijuana could not be seen by anyone standing on land other than Oliver's. These fields were located about one mile from Oliver's house by road and almost that far in a direct line. The fields had been leased by Oliver to some strangers.[2]

After Oliver's arrest and indictment for knowingly and intentionally manufacturing marijuana, 21 U.S.C. § 841(a)(1) (1976) and 18 U.S.C. § 2 (1976), the district court upheld Oliver's motion to suppress the marijuana evidence, relying on analysis it derived from *Katz*. The district court held that this search required a warrant because, under the circumstances presented here, Oliver had an expectation of privacy and the expectation was a reasonable one. The government then took this appeal. A panel of this court agreed with the analysis and conclusion of the district court and affirmed (657 F.2d 85 (6th Cir. 1981)) after which this court heard the appeal *en banc*.

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court held that it was error to admit into evidence the defendant's end of a telephone conversation that was recorded, without a warrant, by means of a device placed on the *outside* of a telephone booth. "For the Fourth Amendment protects people, not places." *Id.* at 351, 88 S.Ct. at 511. Thus,

---

1. Appellant, the United States, does not contend that the agents had probable cause for the search or that, if they did have such cause, there were exigent circumstances that would excuse getting a search warrant.

2. The United States does not question Oliver's standing to raise this Fourth Amendment issue but does rely on this leasing to the extent, if any, that Oliver's expectation of privacy is an issue.

reasoned the Court, since Katz had a reasonable expectation of privacy when he entered the booth, closed the door, and paid the toll for the call, it was a violation of the Fourth Amendment to record the conversation without a warrant. In the instant case, it is argued that, since under the circumstances Oliver had a reasonable expectation of privacy with respect to the fields of marijuana, it follows that he, too, was entitled to Fourth Amendment protection. We disagree with this conclusion for several reasons.[3]

In the first place, it is apparent that the Court in *Katz* was called upon to consider application of the Fourth Amendment under circumstances that could not have been contemplated at the time the Amendment was formulated and adopted. As the opinion for the Court by Justice Stewart states: "To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." *Id.* at 352, 88 S.Ct. at 511. Moreover, in his concurring opinion, Justice Harlan states that the prior holding of the Court in *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), "that electronic surveillance accomplished without the physical penetration of petitioner's premises by a tangible object did not violate the Fourth Amendment," *Katz, supra* 389 U.S. at 362, 88 S.Ct. at 517, must be overruled because "[i]ts limitation on Fourth Amendment protection is, in the present day, bad physics as well as bad law, for reasonable expectations of privacy may be defeated by electronic as well as physical invasion." *Id.* On the other hand, here we are called upon to apply the Fourth Amendment to an open field. As Justice Holmes said in *Hester*: "[T]he special protection accorded by the 4th Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl.

Com. 223, 225, 226." 265 U.S. at 59, 44 S.Ct. at 446.

■ A second reason why we conclude that *Katz* did not amend the existing open fields doctrine is that *Katz* itself recognizes the continuing validity of the *Hester* proposition that the Fourth Amendment does not protect an owner as to his open fields. In the opinion for the Court, Justice Stewart alludes to the fact that the parties to that litigation considered it to be common ground that, on the basis of *Hester*, an open field is outside the reach of the Fourth Amendment. 389 U.S. at 351 n.8, 88 S.Ct. at 511 n.8. The opinion does not suggest that under certain circumstances it would not be. More importantly, in his concurring opinion, Justice Harlan states: "I join the opinion of the Court, which I read to hold only (a) that an enclosed telephone booth is an area where, like a home, *Weeks v. United States*, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652] ..., and unlike a field, *Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] ..., a person has a constitutionally protected reasonable expectation of privacy ...." *Id.* 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring) Justice Harlan further states:

> As the Court's opinion states: "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders

---

**3.** It is, of course, immaterial that the narcotics agents here may have committed a trespass under state law. Indeed, even if Kentucky law had required a warrant, this would not affect our decision of this Fourth Amendment question. *United States v. Hassell*, 336 F.2d 684, 685 (6th Cir. 1964), citing *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. Cf. *Hester v. United States,* supra.

*Id.* 389 U.S. at 361, 88 S.Ct. at 516.

■ We conclude, therefore, that *Katz* does not require an *ad hoc* investigation of the circumstances to determine whether the owner of an open field had an expectation of privacy and whether the expectation was reasonable. Rather we conclude that under *Hester* and *Katz* any expectation of privacy that an owner might have with respect to his open field is not, *as a matter of law*, an expectation that society is prepared to recognize as reasonable.[4]

We further point out, in support of our conclusion that the open fields doctrine as stated in *Hester* survived the *Katz* decision, that the Supreme Court has on several occasions since *Katz* referred to the *Hester* decision without indicating that its principle has been diluted. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 430 n.12, 58 L.Ed.2d 387 (1978); *G. M. Leasing Corp. v. United States,* 429 U.S. 338, 352, 97 S.Ct. 619, 628, 50 L.Ed.2d 530 (1977); *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); and *Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 865, 94 S.Ct. 2114, 2115, 40 L.Ed.2d 607 (1974).

■ Finally, it was suggested at argument that, since these marijuana fields were not observable while standing on land other than Oliver's, these fields were not "open fields" within the meaning of *Hester*

and *Hassell.* It is clear, however, that the rule in these cases is meant to distinguish between curtilage and land outside the curtilage. *See, e.g., United States v. Whitmore,* 345 F.2d 28, 29 (6th Cir. 1965) (per curiam), *cert. denied sub nom. Anderson v. United States,* 382 U.S. 991, 86 S.Ct. 568, 15 L.Ed.2d 478 (1966), citing and relying on both Justice Holmes's opinion in *Hester* and the opinion of this court in *Hassell.* These fields were not within Oliver's curtilage.

■ We believe that no privacy rights inhere and the Fourth Amendment does not protect an open field of marijuana. It would protect a person in an open field or a house built there but not the field itself. We do not understand what the concept is behind the dissenting view that some element of privacy attaches to an open field, a field empty of persons and empty of the houses, papers and effects of persons. The dissenting opinion does not suggest what that concept is or how privacy comes into play. The Fourth Amendment and other laws protecting privacy create the conditions and the context for many relationships based on intimacy, friendship and trust. These laws establish an environment in which individual emotional and mental processes can develop freely without surveillance or interference. The legal principles that protect privacy, therefore, do not protect the desert island, the mountain top or the open field—even one the owner has posted with a "no trespass" sign. The human relations that create the need for privacy do not ordinarily take place in these settings. The only significant interest at stake here—a property owner's interest in excluding others from his possessions—is not sufficient alone to bring into play legal principles protecting privacy.[5]

---

4. The district court's decision that Oliver had a reasonable expectation of privacy is largely based on the fact that the narcotics agents passed "No Trespassing" signs and a locked gate in making the search. If, however, they had made the search by helicopter, or on the ground but from another direction where there were no signs or a locked gate, there would have been no reasonable expectation of privacy. Thus the decision of the district court would seem to add still another refinement to

Fourth Amendment law—i.e., that protection would depend upon the direction from which the search was accomplished. *Hester,* in its pristine simplicity, has obvious advantages.

5. If we were free to make this decision as if it were a mere policy matter, our decision would be the same. The reason is that, in weighing the privacy interest of the owner of open fields against the public interest in law enforcement's making random investigations to detect the

The order of the district court suppressing the evidence is therefore reversed and the case is remanded for further proceedings consistent with this opinion.

KEITH, Circuit Judge, with whom GEORGE CLIFTON EDWARDS, Jr., Chief Judge, and LIVELY and NATHANIEL R. JONES, Circuit Judges, join dissenting.

We respectfully dissent from the position taken by the Court in this very important case. Today our Court adopts a *per se* rule with respect to the open fields doctrine. This Court's position is contrary to that of the First, Second, Fourth, Fifth, Seventh and Tenth Circuits who have rejected the *per se* rule in favor of a more reasonable and flexible rule similar to the rule set forth in this dissent. We also note that a majority of the state courts, including California, Florida, Illinois, Louisiana and Hawaii, have also rejected the *per se* rule. Therefore, our Court's intransient position is difficult to understand.

Appellee Ray Edward Oliver was indicted and charged with manufacturing marijuana in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. At a pre-trial suppression hearing, the district court sustained Oliver's motion to exclude evidence obtained from the warrantless search of his property. The Oliver property was fenced and posted with "No Trespassing" signs. The evidence the government sought to admit consisted of marijuana discovered growing in a field on Oliver's property. The marijuana was not visible from the public road or the land of Oliver's neighbors.

On appeal, the government argued that a warrantless search of the land beyond the curtilage [1] can never violate the Fourth Amendment as a matter of law. The government contended the district court's refusal to admit the marijuana found growing on Oliver's field was contrary to the Supreme Court's holding in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). A panel of this Court considered this question and others raised in the appeal on a previous occasion. *See United States v. Oliver*, 657 F.2d 85 (6th Cir. 1981). The panel held that officers who conducted a warrantless search which included traveling a mile and a half on the landowner's private road past several "No Trespassing" signs, and walking around a locked gate to view growing fields of marijuana violated the landowner's reasonable expectation of privacy guaranteed by the Fourth Amendment.

The Court granted en banc consideration of this appeal to address the following two issues: 1) Whether a warrantless search beyond the curtilage may violate the Fourth Amendment; and 2) Whether a warrantless search conducted by the Kentucky State Police on posted land violated the landowner's reasonable expectation of privacy.

## FACTS

Appellee Ray Edward Oliver ("Oliver") is a 62 year old retired farmer. His 200 acre farm is located in rural Kentucky, 20 miles from the nearest town, Jamestown, Kentucky. He lives on his farm with his wife and daughter. Much of the Oliver farm is leased to third parties who use the land for agricultural purposes.[2] Oliver owns no farm equipment, but does raise hogs.

On or about July 18, 1980, the Kentucky State Police received an anonymous tip that marijuana was being cultivated on the Oliver farm.[3] Kentucky State Police Detectives Ben Hadley and Jimmy Antle decided

---

production of drugs and moonshine, the public interest should prevail.

1. The "curtilage of the house is frequently defined as the domestic use immediately surrounding a dwelling which usually is fenced in with the dwelling." *See United States v. LaBerge*, 267 F.Supp. 686, 692 (D.Md.1967); *United States ex rel. Saiken v. Bensinger*, 546 F.2d 1292, 1296 (7th Cir. 1976).

2. A total of four people leased portions of the Oliver farm.

3. Detective Hadley also testified that "people in the community" had "more or less said" that "it didn't look right down on Ray's farm."

to investigate the tip that afternoon. The detectives made no attempt to secure a search warrant[4] or obtain permission to search the Oliver farm. The detectives wore plain clothes and drove a black Firebird, an unmarked state police vehicle.

The detectives approached the Oliver farm on Kentucky Highway 379, a paved public road. The detectives gained access to the Oliver farm by turning off Highway 379 and onto a gravel, private road on Oliver's land. Oliver owned the land on both sides of the gravel road. The detectives admitted that they knew the gravel road was Oliver's private road. The greater the distance from the public road the narrower the gravel road became. "No Trespassing" signs were posted along the gravel road in at least four locations. The officers saw the signs, but ignored their warning.

Hadley and Antle drove past the signs and travelled several hundred yards before they passed the Oliver home. The gravel road became markedly narrower after it passed the Oliver home. The agents never attempted to obtain permission to search the Oliver farm. Instead, they proceeded an additional ¾ of a mile further on the Oliver property. Finally, a locked metal gate blocked their path.

The detectives parked and exited the car. The officers could see no contraband. Fences were on either side of the gate. At one end of the gate a path led through a gap in the fence. A "No Trespassing" sign was posted on the locked metal gate. The detectives admitted seeing the sign, but again ignored the warning. The detectives followed the path around the locked gate.

A barn and a truck camper were located several hundred yards beyond the gate. The camper was parked in front of the barn. Unnamed third persons cultivating the marijuana inhabited the camper as a "home."[5]

The detectives approached the barn, looked around, but did not enter the barn. The detectives did not see anyone. The marijuana fields could not be seen from the barn. The detectives continued their search on foot. The gravel road had become an earthen path. The officers proceeded approximately ¼ of a mile further through fields and wooded areas on a curved earthen path. Shouts halted their progress.

An unidentified man standing in front of the camper hollered, "No Hunting Is Allowed, Come Back Here!" Hadley and Antle halted their progress, turned, and shouted that they were State Police. Hadley and Antle's search thus far had not detected the presence of marijuana on the Oliver farm. The two officers began to walk back to the camper. The man who had yelled was not present when Hadley and Antle arrived at the camper. Detective Hadley looked inside the camper, but still did not see anyone. He closed the door of the camper. The two men began their search anew.

The officers returned to the location where shouts had halted their progress and continued walking. Eventually, they entered a secluded field and saw marijuana. The marijuana was located in a field which had been leased to third persons not named in this action. The field was located 1 and ⁴⁄₁₀ mile from the Oliver home. After discovering the marijuana Detectives Hadley and Antle returned to their car and left the farm. They met Oliver on the public road. Oliver was arrested and taken back to his farm. Later, Oliver arranged for a tractor to destroy the marijuana. At Hadley's request, Oliver directed the detectives to a second leased area where more marijuana was found and destroyed.

The marijuana fields were "highly secluded: they were bounded on all sides by woods, fences and embankments." In fact, the fields were not visible from the Cumberland River, the barn, the locked metal

---

**4.** The government admits that the detectives did not have probable cause to search the Oliver farm. The government also concedes that there were no exigent circumstances which would excuse the lack of a search warrant.

**5.** The camper was equipped with a refrigerator. Camping supplies were nearby. Eggs, bacon, and "iced down beer" were also present in the camper.

gate, the Oliver home, the public highway, the lands owned by Oliver's neighbors, or the nearest point of public access. The Oliver farm was posted and fenced. Within two weeks after the marijuana had been destroyed on the Oliver farm, the Kentucky State Police began using a helicopter to conduct surveillance of suspected marijuana fields in the area.

## I. THE OPEN FIELD EXCEPTION TO THE FOURTH AMENDMENT

### A. Hester v. United States

The Open Fields Doctrine states that the Fourth Amendment does not extend to activities conducted in any area beyond the curtilage of a home. The continued validity of this doctrine has been the subject of much debate since the seminal decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This en banc hearing is a poignant illustration of the heated confusion surrounding the doctrine. Much of the confusion has been produced by a failure to distinguish between the holding in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 and the birth of the Open Fields Doctrine in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

In *Hester*, the Supreme Court held that federal agents could trespass on an area where the public was not excluded during a warrantless search and view that which was exposed to the public without violating the Fourth Amendment. That which is observable by the public is observable by a federal agent without a warrant. Revenue agents had prior information concerning Hester's involvement in the manufacture of illegal moonshine whiskey. Based on this information, two agents approached the Hester home at night. The agents concealed themselves 50 to 100 yards away from the house when an automobile approached. Later, the agents saw Hester come out of the house and hand Henderson a quart bottle. An alarm was given. Hester and Henderson ran. Both men dropped bottles which were later determined to contain moonshine

whiskey. Hester alleged that the search and seizure was illegal because the agents did not have a search warrant and had trespassed on his land. The Court disagreed. "This evidence was not obtained by the entry into the house and it is immaterial to discuss that." *Id.* 265 U.S. at 58, 44 S.Ct. at 446. "The special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to [events observable from] the open fields." *Id.* at 59, 44 S.Ct. at 446.

Three years later in *United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927), the Supreme Court reaffirmed the holding in *Hester*. A Coast Guard patrol boat followed a motor boat which was suspected of being a rum runner. Sometime after sunset, the Coast Guard lost the motor boat in the fog. When the motor boat was again located, cases of liquor were on its deck. Defendant Lee and two associates were arrested. Lee's conviction was vacated in the Court of Appeals on the ground that the search and seizure was illegal. The Supreme Court reversed. The contraband was visible to the boating public on the high seas.

"[N]o search on the high seas is shown. The testimony of the boatswain shows that he used a searchlight. It is not shown that there was any exploration below decks or under hatches. For aught that appears, the cases of liquor were on deck and, like the defendants, were discovered before the motor boat was boarded. Such use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution. Compare *Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898]."

### B. Olmstead Open Fields Doctrine

The following year, the Open Fields Doctrine was born in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). The doctrine is a combination

of the "open field" phrase coined in *Hester*[6] and *Olmstead's* holding that the Fourth Amendment is not violated unless there has been "an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure." *Olmstead*, 277 U.S. at 466, 48 S.Ct. at 468.

In *Olmstead*, federal prohibition officers tapped the phones of Olmstead and several of his associates. The wire taps were installed without trespass upon any property of the defendants. A massive conspiracy to import, possess, and sell liquor was uncovered as a result of the taps. Olmstead alleged that the evidence derived from the phone tap constituted an illegal search and seizure. The court disagreed and adopted an analysis which focused on physical invasion of "constitutionally protected areas."

"The Amendment does not forbid what was done here. There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendants." *Id.*, at 464, 48 S.Ct. at 567.

\* \* \* \* \* \*

"Justice Bradley in the *Boyd* case, and Justice Clark in the *Gouled* case, said that the Fifth Amendment and the Fourth Amendment were to be liberally construed to effect the purpose of the framers of the Constitution in the interest of liberty. But that cannot justify enlargement of the language employed beyond the possible practical meaning of houses, persons, papers, and effects, or so to apply the words search and seizure as to forbid hearing or sight.

*Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], held that the testimony of two officers of the law who trespassed on the defendant's land, concealed themselves one hundred yards away from his house and saw him come and hand a bottle of whiskey to another, was not inadmissible. While there was a trespass, there was no search of person, house, papers, or effects. *United States v. Lee*, 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L.Ed. 1202]; *Eversole v. State*, 106 Tex.Cr. 567 [294 S.W. 210]." *Id.*, 277 U.S. at 465, 48 S.Ct. at 567.

\* \* \* \* \* \*

"Neither the cases we have cited nor any of the many federal decisions brought to our attention hold the Fourth Amendment to have been violated as against a defendant unless there has been an official search and seizure of his person, or such a seizure of his papers or his tangible materials effects, or an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure.

We think, therefore, that the wire tapping here disclosed did not amount to a search or seizure within the meaning of the Fourth Amendment." *Id.*, at 466, 48 S.Ct. at 568.

After the seminal decision in *Olmstead*, the *Hester* holding could best be stated as follows: the open field area beyond the curtilage is not an area entitled to Fourth Amendment protection. The Olmstead Open Fields Doctrine's core, therefore, was that an open field was not a "constitutionally protected area."[7] The locational analysis inherent in the Open Fields Doctrine was woodenly applied for decades.[8] *See,*

---

**6.** In *Hester*, the term "open field" was used to describe the area beyond the curtilage from which the public was not excluded. Note that *Olmstead* uses the label "open field" to denote any area beyond the curtilage.

**7.** *Olmstead's* per se rule enabled law enforcement officials to conduct warrantless searches of any area outside the curtilage at any time for any reason.

**8.** In *Hassell* federal agents suspected Hassell of operating an illicit still. Agents visited the de-

fendant's premises in the company of Hassell, sniffed around his barnyard, and satisfied themselves that the odor did not emanate from there. The agents subsequently followed the scent to an adjacent open field and found the still. The court disposed of Hassell's contention that the search by the agents was illegal in a single sentence: "Under federal law the search of open fields without a search warrant is not constitutionally 'unreasonable.' *Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (1926)." *Id.*, at 685.

*e.g., United States v. Hassell*, 336 F.2d 684, 685 (6th Cir. 1964).

## C. Katz v. United States

*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 overruled the Fourth Amendment "constitutionally protected area" or actual physical invasion analysis epitomized by *Olmstead*. *Katz* holds that "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures." *Id.* at 353, 88 S.Ct. at 512. However, "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. *See Lewis v. United States*, 385 U.S. 206, 210 [87 S.Ct. 424, 427, 17 L.Ed.2d 312]; *United States v. Lee*, 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L.Ed. 1202]." *Id.* at 351, 88 S.Ct. at 511.

In *Katz*, FBI agents bugged a public telephone booth by attaching an electronic listening and recording device to the outside of the booth. Katz alleged that the bugging violated the Fourth Amendment. The government disagreed. The parties compiled competing lists of "protected areas" for the Court's consideration. The parties agreed that a private home was a protected area, citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, but that an open field was not, citing *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898. *Katz* 389 U.S. at 351 n.8, 88 S.Ct. at 511 n.8, at 511 n.8.

The Court rejected the parties contentions stating "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase "constitutionally protected area." *Id.* at 350, 88 S.Ct. at 510. "We have never suggested that this concept can serve as a talismanic solution every Fourth Amendment problem." *Id.* at 351 n.9, 88 S.Ct. at 511 n.9. "This effort to decide whether or not a given 'area', viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly

exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. *See Lewis v. United States*, 385 U.S. 206, 210 [87 S.Ct. 424, 427, 17 L.Ed.2d 312]; *United States v. Lee*, 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L.Ed. 1202]." *Id.* 389 U.S. at 351, 88 S.Ct. at 511. The Court also rejected the Government contention that the activities of the agents should not be tested by the Fourth Amendment because the technique they employed did not physically penetrate the phone booth from which Katz placed his calls. The Court held:

"It is true that the absence of such penetration was at one time thought to foreclose further Fourth Amendment inquiry, *Olmstead v. United States*, 277 U.S. 438, 457, 464, 466 [48 S.Ct. 564, 565, 567, 568, 72 L.Ed. 944] . . . Thus, although a closely divided Court supposed in *Olmstead* that surveillance without any trespass and without the seizure of any material object fell outside the ambit of the Constitution, we have since departed from the narrow view on which the decision rested. Indeed, we have expressly held that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements, overheard without any "technical trespass under . . . local property law." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734. Once this much is acknowledged, and once it is recognized that the Fourth Amendment protects people—and not simply "areas"—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

We conclude that the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the "trespass" doctrine there enunciated can no longer be regarded as controlling. The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the

telephone booth and thus constituted a "search and seizure" within the meaning of the Fourth Amendment. The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance." *Id.* 389 U.S. at 352–353, 88 S.Ct. at 511–12.

Justice Harlan's concurring opinion in *Katz* also rejects *Olmstead*'s intrusion into "constitutionally protected area" analysis. He, too, reasoned that "the Fourth Amendment protects people, not places." [9] However, he acknowledged that the measure of protection the Amendment affords to those people generally requires reference to a place. He announced a two-part test to determine whether an activity conducted in a given place is entitled to Fourth Amendment protection. "First, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation is one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516. The two examples which follow this test demonstrate that an expectation of privacy can virtually never be reasonable if the activity or conversation is exposed to the public. "Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. *Cf. Hester v. United States, supra.*" *Id.*, at 361, 88 S.Ct. at 516.

## II. THE MODERN OPEN FIELDS DOCTRINE

*Katz* radically altered Fourth Amendment analysis in at least two major respects material to this action. First, the narrow holding in *Hester* that federal agents could

trespass onto an area from which the public was not excluded and view that which was exposed to public view, without violating the Fourth Amendment remained viable. Second, the Olmstead Open Fields Doctrine that the area beyond the curtilage was not a "constitutionally protected area" was overruled. Consequently, warrantless searches for objects not exposed to the public, located in areas where the public is excluded are subject to the "reasonable expectation of privacy" test of *Katz*.

*Air Pollution Variance Board v. Western Alfalfa*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), reaffirmed the continued validity of *Hester's* narrow holding. In *Western Alfalfa* the court held that a federal agent could trespass on an area where the public was not excluded during a warrantless search and view that which was exposed to the public without violating the Fourth Amendment. A state inspector trespassed on the outdoor premises of a business establishment without its knowledge or consent. The inspector entered the business premises to conduct a pollution test of smoke being emitted from the business's chimneys. *Id.* at 862–863, 94 S.Ct. at 2114. Justice Douglas speaking for a unanimous Court held:

"The field inspector did not enter the plant or offices. He was not inspecting stacks, boilers, scrubbers, flues, grates, or furnaces; nor was his inspection related to respondent's files or papers. He had sighted what anyone in the city who was near the plant could see in the sky— plumes of smoke. The Court in *Hester v. United States*, 265 U.S. 57, 59 [44 S.Ct. 445, 446, 68 L.Ed. 898] speaking through Mr. Justice Holmes, refused to extend the Fourth Amendment to sights seen in "the open fields." The field inspector was on respondent's property but we are not advised that he was on premises from which the public was excluded.... Depending on the layout of the plant, the inspector may operate within or without the prem-

9. Justice Harlan opined that *Katz* overruled *Olmstead*. *Katz*, 389 U.S. at 362, 88 S.Ct. at 517.

ises but in either case he is well within the "open fields" exception to the Fourth Amendment approved in *Hester*." *Id.* at 865, 94 S.Ct. at 2115.

*Western Alfalfa* defines the contours of the Open Fields Doctrine. The Supreme Court did not simply ratify the per se rule of the Olmstead Open Fields Doctrine. The invalidity of the Olmstead Open Fields Doctrine is amply demonstrated by the Court's reliance on a fact not affirmatively established in the record. The Court emphasized that "we are not advised that he was on premises from which the public was excluded . . . ." This statement is particularly significant for the public's access to the business premises would have been immaterial if the Court had based its decision on the Olmstead Open Fields Doctrine. *Olmstead's* per se rule would have enabled the inspector to trespass on the premises without regard to whether the public was excluded or not.

The rationale underlying *Hester*, the open fields exception to the Fourth Amendment, and *Western Alfalfa* was articulated in *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). The Court distinguished between a warrantless administrative search conducted over the objection of the landowner and a warrantless search conducted in an area where the public is not excluded. The Court concluded that without a search warrant, the government agent is in no better position than a member of the public. Observations capable of being made by the public can be made by government agents without a warrant.

"Employees are not being prohibited from reporting OSHA violations. What they observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy. The Government inspector, however, is not an employee. Without a warrant he stands in no better position than a member of the public. What is observable by the public is observable, without a warrant, by the Government inspector as well. The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents." *Id.* at 315, 98 S.Ct. at 1821.

In sum, the Open Fields Doctrine's premise is that government agents without warrants are in the same position as the public and may make observations from any location from which the public is not excluded. The visibility of the object and the public's access to the location are the two determinants of whether the Open Fields exception applies. Objects exposed to public view, even when located in areas from which the public is excluded, are not entitled to Fourth Amendment protection. The owner has not exhibited an intent to keep the item private, thus the seizure of the item will not violate his reasonable expectation of privacy. *See Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan concurring). On the other hand, the open fields doctrine enables government agents to trespass onto private areas from which the public is not excluded and make observations. *See Hester*, 265 U.S. at 58–59, 44 S.Ct. at 446; *Western Alfalfa*, 416 U.S. at 865, 94 S.Ct. at 1115. *See also, Marshall*, 436 U.S. at 315, 98 S.Ct. at 1821.[10]

The open fields doctrine has frequently been utilized to uphold warrantless searches conducted on private property where the public has not been excluded. In *United States v. Miller*, 589 F.2d 1117 (1st Cir. 1978), the First Circuit held that a warrantless search of a secluded private peninsula was permissible pursuant to the open fields exception to the Fourth Amendment. The court found that "the appellant made no attempt to secure his open land from un-

---

**10.** The Open Fields Doctrine enables government agents to trespass onto private land from which the public is not excluded and make observations. *See Hester*, 265 U.S. at 58–59, 44 S.Ct. at 446; *Western Alfalfa*, 416 U.S. at 865, 94 S.Ct. at 1115 and *Marshall*, 436 U.S. at 315, 98 S.Ct. at 1821. The Plain View Doctrine sanctions inadvertent observations made by government agents who were lawfully in a location. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

wanted visitors." The court stated: "The land involved here was not posted; there was no fence or chain to impede visitors; the officers approached openly in broad daylight. Thus, the entry was permissible." *Id.* at 1134.

In *Patler v. Slayton*, 503 F.2d 472 (4th Cir. 1974), the Fourth Circuit held that the open fields doctrine as announced in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) enabled police officers to conduct a warrantless search for spent bullets located in a picnic area near the house. "It had been established that the farm was not posted against trespassers." *Patler v. Commonwealth*, 211 Va. 448, 177 S.E.2d 618, 620 (1970), *cert. denied, Patler v. Virginia*, 407 U.S. 909, 92 S.Ct. 2445, 32 L.Ed.2d 682 (1972). *See United States v. Ramapuram*, 632 F.2d 1149, 1155 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *United States v. Van Dyke*, 643 F.2d 992, 994 (4th Cir. 1980).

In *United States v. Lace*, 669 F.2d 46 (2d Cir. 1982) the Second Circuit held that observations made by police officers while trespassing on private land were admissible. "The land was not posted and was used freely by hunters. Outsiders could enter the open property at will. Therefore, Butts' [the defendant's] action outside the buildings could easily be observed by any person going on the land. What was observable by the general public was observable without a warrant by the police as well."

In *United States v. Edmonds*, 611 F.2d 1386 (5th Cir. 1980) *rehearing denied*, 615 F.2d 919, federal agents seized several hundred bales of marijuana being unloaded at Morgan's Dock, a commercial fishing business and dock. To reach the dock the agents drove down a dirt road. The road was posted with a sign which read, "private road—no trespassing." The defendants argued that nothing the agents observed was admissible because Morgan's Dock was private property and the officers were trespassers. The court disagreed.

"While there was a 'no trespassing' sign on the entrance road leading to the premises, an officer who had resided in the area for 23 years testified that the reputation in the community was to the effect that the public was welcome to use the dock area and that the public did use it. The district court found that despite the sign the public had long had free access to the dock, and that conclusion is not plainly erroneous. Other than the presence of the sign, there was no evidence that the dock was 'private' to owner Morgan and those specifically authorized to use it. This was not a dock for private use for either fishing, or embarkation and debarkation of boats, or docking and storage. It was a place not only where boats docked and were unloaded but also a place of business activity where necessarily persons and vehicles had to come and go. The parking lot was open. The officers were not trespassers. They invaded the expected privacy of no one when they drove into the parking lot at the dock." *Id.* at 1388. *Accord Ehlers v. Bogue*, 626 F.2d 1314, 1315 (5th Cir. 1980) (open fields doctrine enables county inspector to trespass and make observation from location where public was not excluded).

In *Patterson v. National Transportation Safety Board*, 638 F.2d 144 (10th Cir. 1980), a federal aviation safety inspector observed an airplane while it was in an open area of a private airport. The Tenth Circuit held that the observations were an admissible warrantless search under the open field doctrine. The Court held:

"Cedar Valley Airport, as we understand it, is a private airport, as opposed to a municipal airport. From the record, it is unclear who owns it. It would appear that the public was allowed access to the airport proper even though it was privately owned and operated. Be all that as it may, it would appear that Broadbent's inspection was made in an open area. The plane had not been placed in any hangar or building. Under such circumstances, the 'search' of Patterson's plane, if indeed it be a search, comes well within the 'open fields' exception to the

Fourth Amendment. *Air Pollution Variance Bd. v. Western Alfalfa Corp.*, 416 U.S. 861 [94 S.Ct. 2114, 40 L.Ed.2d 607] (1974) and *Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (1924)." *Id.* at 146.

In *United States v. Pruitt*, 464 F.2d 494 (9th Cir. 1972), custom officials observed two individuals unload large boxes from a van "in a stretch of open country" just off the highway. During warrantless searches of the area the officers uncovered boxes and duffel bags containing marijuana. The court held that no reasonable expectation of privacy was violated by the search. "Any casual passerby would feel perfectly free to ascertain what it was what he had found." *Id.* at 496. *Accord United States v. Freie*, 545 F.2d 1217 (9th Cir. 1976), *cert. denied, Gangadean v. United States*, 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977).

In *United States v. Balsamo*, 468 F.Supp. 1363 (D. Maine 1979), the court held that the open fields doctrine enabled police officers to conduct a warrantless search on private property within a subdivision.

"The officers' entry, however, violated no 'legitimate' or reasonable expectation of privacy of the defendants, and thus no Fourth Amendment interest were involved. A large sign advertising lots for sale stood at the entrance to the subdivision, inviting entry by the public to inspect the property. There were no 'No Trespassing' signs or fences restricting access to the property. The owner-developer relied on local police to patrol the subdivision. The use of the common roads was not monitored in any way. Any subjective belief defendants may have had that their activities would go undetected was neither legitimate or reasonable." *Id.* at 1379.

By contrast, courts have consistently held that the open fields exception is not applicable where the warrantless search was conducted in an area where the public was excluded. In *United States ex rel. Gedko v. Heer*, 406 F.Supp. 609 (W.D.Wis.1975), vacated without op., dismissed without op., *Gedko v. Cady*, 588 F.2d 840 (7th Cir. 1978),

police officers trespassed onto private property to observe the activities of an individual suspected of cultivating marijuana. The government attempted to use the open fields doctrine to justify their warrantless search. The court held that the open fields exception to the Fourth Amendment was not applicable.

"Petitioner established in state court that his property was fenced; that the law enforcement officers entered onto his property by climbing over the fence; that no express consent was given to the law enforcement officers to enter onto his property; that his property was wooded and hilly; and that he and his wife were the owners of the property, which was a 160 acre farm located in rural south-western Wisconsin. In addition, there was undisputed testimony at the suppression hearing that the nearest public road was approximately six-tenths of a mile from the farm yard and that there was a No Trespassing sign posted on the property at the gate where the land runs into the highway.

In my opinion, these facts demonstrate that petitioner had a reasonable, exhibited, and justifiable expectation of privacy as to his activities and conversations not observable or audible beyond the boundaries of his own property." *Id.* at 615–16.

In *United States v. Berkshire Beagle Club*, Slip Op. M.B.D. No. 80–24–F (D.Mass., August 5, 1981), a federal agent trespassed onto the fenced and posted 200 acre tract of the Berkshire Beagle Club and seized several traps used to capture migratory birds such as the Great Horned Owl. The tract of land was "surrounded by a 1¼" wire mesh fence approximately five feet high. The fence is posted with 'No Trespassing' signs." The agent "gained access to the premises by opening an apparently unlocked gate." The leg-hold traps were not in plain view. The agent had to enter the defendant's property to observe the traps. The government argued that the warrantless search was proper under the open fields doctrine. The court disagreed, holding the search violated the Fourth Amendment.

In *United States v. FMC Corporation*, 428 F.Supp. 615 (W.D.N.Y.1977), *aff'd*, 572 F.2d 902 (2d Cir. 1978), the court held that warrantless searches conducted by state officials on the grounds of a manufacturing plant did not fall within the "open fields" exception to the Fourth Amendment.

"Defendant's Middleport plant includes a completely fenced-in facility of approximately 100 acres and a separately fenced lagoon of approximately 10 acres. The fence around the lagoon is 8 feet high, topped with barbed wire. Access to the lagoon through the fence is at a main gate which is approximately 150 feet from the fence of the main plant across the public utility easement. There is one other small gate used in connection with pond drainage. According to the affidavit of William C. Cole, Jr., the plant manager, it is defendant's practice to keep both gates closed and locked except when plant personnel are in the lagoon area. This court finds that the highly restricted access to the lagoon and the manner in which it was enclosed do not permit application of the 'open fields' exception in this case." 428 F.Supp. at 618.

In *State v. Byers*, 359 So.2d 84 (La.Sup. Ct.1978) the court held that the open fields doctrine was inapplicable where the marijuana plants were being cultivated in an area not exposed or accessible to the public. Police conducted at least two warrantless searches of private 640 acre tract of land to observe a plot of growing marijuana. None of the marijuana plants were visible from the public road or from outside the property. "The property was posted with signs. These signs bore such announcements as: 'PRIVATE ROAD; DO NOT ENTER'; 'POSTED NO HUNTING, FISHING, TRESPASSING'; 'POSTED NO HUNTING.' In addition to these signs, the trial judge found that one of the defendants had 'posted signs along one of the logging roads leading from the public road into the property and erected two posts set in concrete and connected with a chain in an effort to deny access to the general public.'" *Id.* at 85. The court held:

"In the present case, the marijuana was not visible from the public road. The posted signs announced that the logging road was private and prohibited entry of the land. A chain barred access to the private road, though it was down at the time of the arrest and seizure. We conclude, under these circumstances, the defendants had a legitimate expectation of privacy." *Id.* at 86.

In *State of Florida v. Brady*, 406 So.2d 1093 (Fla.Sup.Ct.1981), the court held that observations conducted on private property were not encompassed within the open fields exception where police were required to cross and cut posted fences to gain access to a location where the contraband could be seen. Police observed the arrival and unloading of a large amount of marijuana from an airplane which landed on a secluded farm. However, to position themselves to make these observations the police officers crossed a dike, rammed through a gate, cut the chain lock on another gate, cut or crossed posted fences, and proceeded several hundred feet to their observation posts. The court held that the warrantless search violated the Fourth Amendment.

"Although the *Hester* opinion has not been overruled, subsequent opinions indicate that the open fields doctrine cannot be used as carte blanche for a warrantless search simply because the location searched is not part of a dwelling or its adjacent curtilage. As the Court has later observed in its opinion in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) '. . . the Fourth Amendment protects people not places.' Our opinion in *Norman v. State*, 379 So.2d 643 (Fla.Sup.Ct.1980) made it clear that fences and locked gates are evidence of the owner's or possessor's expectation of privacy."

## III. THE WARRANTLESS SEARCH OF THE OLIVER FARM

The privacy interests protected by the Fourth Amendment are jealously guarded. "[S]earches conducted outside the judicial process, without prior approval by judge or

magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). *See e.g., Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). The burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment. *See Coolidge*, 403 U.S. at 454–55, 91 S.Ct. at 2032; *Wilson v. Health Hospital*, 620 F.2d 1201, 1208 (7th Cir. 1980).

In the instant case Kentucky State Police officers conducted a warrantless search of the Oliver farm and discovered marijuana under cultivation. The Government seeks to introduce evidence gathered as a result of the warrantless search on the ground that the search was conducted within the Open Fields exception to the Fourth Amendment. The Government argues that the Open Fields Doctrine is a per se rule that Fourth Amendment protections do not extend beyond the curtilage. At the suppression hearing the district court disagreed and ruled that the search was not within the open fields exception. On appeal a three judge panel of this court affirmed the district court. *See United States v. Oliver*, 657 F.2d 85. En banc consideration of this case was granted to enable the full court to consider the issue. We disagree with the majority and would hold that the warrantless search conducted on the Oliver farm does not fall within the Open Fields Doctrine established in *Hester*, 265 U.S. at 59, 44 S.Ct. at 446, and more recently applied in *Western Alfalfa*, 416 U.S. at 865, 94 S.Ct. at 1115.

The essence of the Open Fields Doctrine, as was explained earlier, is that government agents without a warrant are in the same position as the public and may make observations from locations where the public is not excluded. The Open Fields Doctrine enables government agents to trespass onto private areas from which the public is not excluded and make observations. *See Hester*, 265 U.S. at 58–59, 44 S.Ct. at 446; *Western Alfalfa*, 416 U.S. at 865, 94 S.Ct. at 1115.

The narrow, threshold question before the court is simply whether the public is excluded from the Oliver farm. The government concedes that the marijuana under cultivation was not visible from neighboring properties or from any point of public access. In applying the Open Fields Doctrine courts have been acutely sensitive to attempts to exclude the public. In fact, the presence or absence of fences, gates to impede access, and signs which convey warnings such as "No Trespassing" have consistently been a determinate of whether the warrantless search was within the Open Fields Doctrine. *See e.g., Miller*, 589 F.2d 1134 (within exception where not fenced or posted); *Patler*, 503 F.2d 472 (within exception where land not posted); *Lace*, 669 F.2d 46 (within exception where not posted and freely used by hunters); *Balsamo*, 468 F.Supp. 1363 (within exception where not fenced or posted); *Heer*, 406 F.Supp. 609 (outside exception where posted and fenced); *Berkshire Beagle Club*, Slip Op. M.B.D. No. 80–24–F (outside exception where fenced and posted); *FMC Corporation*, 428 F.Supp. 615 (outside exception where high fence topped with barbed wire); *Byers*, 359 So.2d 84 (outside exception where posted and chain gate across road); *Brady*, 406 So.2d 1093 (outside exception where fenced and posted).

In the instant case Oliver's private gravel road was posted. A locked metal gate blocked all vehicle access to most portions of the farm. Although a path did lead around the gate, the gate was posted to ensure that the public went no further. Finally, Hadley and Antle were effectively told to leave the property. The officers were apparently mistaken for hunters. They were told "No Hunting, Come Back Up Here!" This was adequate notice to leave the Oliver farm. We hold that the public was provided with more than adequate notice that they were not to trespass

on the Oliver farm. The warrantless search conducted by Hadley and Antle was not limited to areas of public access. Therefore, the search was not within the narrow confines of the Open Fields Doctrine.

It is not necessary to totally exclude everyone from a given parcel of land before the Open Fields Doctrine is inapplicable. It is enough that a reasonable effort has been made to exclude the public. *See Berkshire Beagle Club*, Slip Op. M.B.D. No. 80–24–F (agent gained access to fenced parcel through closed, but unlocked gate); *Byers*, 359 So.2d 84 (chain gate which normally barred access to the private road was down at time of search and seizure); *Heer*, 406 F.Supp. 609 (agents climbed over posted barbed wire fence).

The second question the court must address is whether the warrantless search violated Oliver's reasonable expectation of privacy. A reasonable expectation of privacy, by definition, is related to time, place and circumstance. *See United States v. Vicknair*, 610 F.2d 372, 380 (5th Cir. 1980); *Ramapuram*, 632 F.2d at 1154. The test, as noted, is: 1) whether the individual by his conduct, has "exhibited an actual (subjective) expectation of privacy," and 2) whether the individual's expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 351, 88 S.Ct. at 511 (Harlan concurring); *Rakas v. Illinois*, 439 U.S. 128, 143–44, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978).

The district court carefully considered the circumstances of the warrantless search of the Oliver farm and held: "Short of posting guards at the entrance, it is difficult to see what else the defendant could have done to assert his privacy interest in this property." We agree. The officers encountered and ignored visual ("No Trespassing" signs), physical (fences and a locked metal gate) and verbal (verbal warning to leave the property) manifestations that Oliver expected privacy. The marijuana was not visible from any point of public access. Consequently, it cannot be doubted that Oliver possessed a subjective expectation of privacy in his farm land.

In *United States v. Oliver*, 657 F.2d 85 (6th Cir. 1981), the panel held that society will accept objective expectations which: 1) are "normally shared by people in that setting"; and 2) "fall within the limits of what society can accept given its interest in law enforcement." *Id.* at 87. We agree. Oliver's expectation of privacy was objectively reasonable. Individuals in similar circumstances would also expect privacy. More importantly, this expectation of privacy would not unduly hamper society's interest in law enforcement. Oliver did not have a reasonable expectation of privacy from planes or helicopters flying overhead. Thus, the officers could have lawfully used airplanes or helicopters to observe the marijuana from the air. *See e.g., United States v. Allen*, 633 F.2d 1282, 1289–90 (9th Cir. 1980); *United States v. Mullinex*, 508 F.Supp. 512 (E.D.Ky.1980); *United States v. DeBacker*, 493 F.Supp. 1078 (W.D.Mich. 1980); *State of Hawaii v. Stachler*, 58 Haw. 412, 570 P.2d 1323 (Hawaii Sup.Ct.1977). *Accord People v. Sneed*, 32 Cal.App.3d 535, 108 Cal.Rptr. 146 (1973) (Fourth Amendment violated by helicopter observation 20 to 25 feet from ground). *Cf. United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927). Observing the fields from the air is a reasonable alternative to warrantless ground searches. The Kentucky State Police recognized this and began using aircraft to observe suspected marijuana fields a short time after Oliver's farm was searched. We hold that Oliver's expectation of privacy was one which society is prepared to accept.

The government argues that the Olmstead Open Fields Doctrine has continuing validity today. We disagree. The Open Fields Doctrine is not a per se rule which justifies all warrantless searches outside the curtilage of a house. The personal freedoms and privacy which all Americans hold dear would be seriously eroded if we approved a carte blanche rule allowing police officers to barnstorm around private property whenever they received an "anonymous tip" that illegal activities were being conducted on the land. Virtually every

court which has considered the issue has held that the Open Fields Doctrine is not a per se rule sanctioning all warrantless searches outside the curtilage. *See e.g., Wilson,* 620 F.2d 1201 (7th Cir. 1980); *Miller,* 589 F.2d 1134; *Patler,* 503 F.2d 472; *Lace,* 669 F.2d 46; *Western Alfalfa,* 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607; *Edmonds,* 611 F.2d 1386; *Patterson,* 638 F.2d 144; *Pruitt,* 464 F.2d 494; *Freie,* 545 F.2d 1217; *United States v. Jackson,* 588 F.2d 1046, 1053 n.12 (5th Cir. 1979); *Ramapuram,* 632 F.2d 1149; *Van Dyke,* 643 F.2d 992; *DeBacker,* 493 F.Supp. 1078; *United States v. Noe,* 494 F.Supp. 1032 (E.D.Ky. 1980); *Balsamo,* 468 F.Supp. 1363; *Heer,* 406 F.Supp. 609; *Berkshire Beagle Club,* Slip Op. M.B.D. No. 80–24–F; *FMC Corporation,* 428 F.Supp. 615; *Byers,* 359 So.2d 84; *Brady,* 406 So.2d 1093; *State of Nebraska v. Camper,* 209 Neb. 376, 307 N.W.2d 820 (Neb.Sup.Ct.1981); *State of Tennessee v. Lakin,* 588 S.W.2d 544 (Tenn.Sup.Ct. 1979); *State v. Stanton,* 7 Or.App. 286, 490 P.2d 1274 (1971); *State of New Mexico v. Chort,* 91 N.M. 584, 577 P.2d 892 (N.M.App. 1978); *People of Colorado v. McClaugherty,* 193 Colo. 360, 566 P.2d 361 (Colo.Sup.Ct. 1977); *State of Iowa v. Bakker,* 262 N.W.2d 538 (Iowa Sup.Ct.1977); *State of Hawaii v. Stachler,* 58 Haw. 412, 570 P.2d 1323 (Hawaii Sup.Ct.1977); *Phelan v. The Superior Court of Mariposh County,* 90 C.A.3d 1005, 153 Cal.Rptr. 738 (Cal.App.1979); *People of the State of Illinois v. Dasenbrock,* 96 Ill. App.3d 625, 52 Ill.Dec. 85, 421 N.E.2d 948 (Ill.App.1981); *Gaylord v. State of Arkansas,* 613 S.W.2d 409 (Ark.App.1981); *Giddens v. State of Georgia,* 156 Ga.App. 258, 274 S.E.2d 595 (Ga.App.1980), *cert. denied,* 450 U.S. 1026, 101 S.Ct. 1733, 68 L.Ed.2d 220 (1981).

We conclude that the Open Fields Doctrine does not apply in this case. Oliver had a subjective and reasonable expectation of privacy concerning his farm. Accordingly, the warrantless search of his farm violated the Fourth Amendment.

LIVELY, Circuit Judge, dissenting.

I am pleased to join in Judge Keith's excellent analysis of the development of Fourth Amendment jurisprudence in the years since *Hester* was decided. However, I am writing separately because I also disagree with the majority on the basic question of whether the marijuana in the present case was found in an "open field" at all. There is no definition of "open fields" in *Hester.* The sketchy statement of facts in the *Hester* opinion does not mention locked gates or even fences, and there is no indication that the property was posted with "No Trespassing" signs. Most importantly, there is nothing in *Hester* which tells us whether the field which was searched was visible from a public road or other place where the officers had a right to be. It is undisputed that the Oliver field in question could not be seen from any surface location from which the public was not excluded. I read Justice Douglas' opinion for a unanimous Supreme Court in *Air Pollution Variance Board v. Western Alfalfa,* 416 U.S. 861, 865, 94 S.Ct. 2114, 2115, 40 L.Ed.2d 607 (1974), as turning on this fact: "The field inspector was on respondent's property but we are not advised that he was on premises from which the public was excluded."

The evidence in the present case makes it clear that the public was excluded from the premises where the officers first viewed the field of marijuana. I find it surprising that the majority overlooks recent refinements of the "open fields" doctrine and is willing to rely so totally on a fact-bare opinion from the Prohibition Era, a period not known for requiring law enforcement officers to act with scrupulous regard for the constitutional rights of suspects.

In short, I believe Ray Oliver had done everything possible to establish his claim to a right of privacy in the back field of his farm. Because of his efforts to exclude uninvited visitors, and the location of the field, his claim of privacy was reasonable. The police would not have been frustrated by the requirement of a search warrant in this case. If their information from the informant was not sufficient to establish probable cause, as Judge Keith has pointed out, the Kentucky State Police could have observed and photographed the Oliver field

from the air and included information thus gained in their affidavit for a warrant. There was no danger that the evidence would be lost by any delay incident to obtaining a warrant.